No. 22-1747

# United States Court of Appeals
## for the First Circuit

---

MASSACHUSETTS CORRECTION OFFICERS FEDERATED UNION (MCOFU); AND
MICHAEL MOSHER,
*Plaintiffs-Appellants*,

ZAC GUSTAFSON; DENINA DUNN; AND ANGELA PUCCI,
*Plaintiffs,*

*v.*

CAROL A. MICI, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE
MASSACHUSETTS DEPARTMENT OF CORRECTION; AND MAURA T. HEALEY, IN HER
OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS,
*Defendants-Appellees.*

---

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

## BRIEF OF DEFENDANTS-APPELLEES

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
Jennifer E. Greaney, 1st Cir. No. 1156842
Christine Fimognari, 1st Cir. No. 1198115
Grace Gohlke, 1st Cir. No. 1204282
*Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2981
jennifer.greaney@mass.gov
christine.fimognari@mass.gov
grace.gohlke@mass.gov

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................v

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

ISSUES PRESENTED.......................................................................................4

STATEMENT OF THE CASE...........................................................................5

    Relevant Facts.............................................................................................5

        1.    The Parties.................................................................................5

        2.    The Executive Order .................................................................6

        3.    The Collective Bargaining Agreement .....................................6

        4.    MCOFU's Prohibited Practices Charge....................................8

        5.    The Arbitration Process ............................................................9

    Relevant Procedural History.......................................................................11

    Rulings Presented for Review .....................................................................13

SUMMARY OF THE ARGUMENT ...................................................................13

    Contracts Clause ........................................................................................13

    Substantive Due Process.............................................................................15

    State Law Claim .........................................................................................15

ARGUMENT ...................................................................................................15

    I.    *De Novo* Review Applies. ..................................................................15

    II.    A Complaint May Be Dismissed Where Warranted as a Matter
        of Law..................................................................................................16

III.    The District Court Correctly Dismissed Count I Because the Complaint Did Not Plausibly Allege a Violation of the Contracts Clause..................................................................17

    A.    The Executive Order Did Not "Substantially Impair" the CBA...........................................................................19

        1.    The Commonwealth's Contractual Relationship with MCOFU Is Subject to the State's Reservation to Itself of Certain Core Managerial Decisions.............19

        2.    The Executive Order Did Not Impair the Commonwealth's Contractual Obligations Under the CBA *At All*..................................................21

            a.    The Complaint Does Not Plausibly Contest that the Decision to Require Vaccination was a Managerial Prerogative Exempt from Collective Bargaining...........................21

            b.    The Complaint Does Not Plausibly Allege that the Executive Order Deprived MCOFU Members of Any Contract Remedy. ...................25

        3.    Even if the Executive Order Impaired Any Obligation of Contract, the Impairment Was Not "Substantial."................................................27

            a.    The Executive Order Did Not Undermine MCOFU's Contractual Bargain. .........................27

            b.    The Executive Order Was Consistent With MCOFU Members' "Reasonable Expectations."......................................................29

            c.    The Executive Order Did Not Prevent MCOFU's Members from Safeguarding Their Rights.........................................................31

B.    The Complaint Does Not Plausibly Allege that the
      Executive Order Was Not an "Appropriate" and
      "Reasonable" Way to Advance a Significant and
      Legitimate Public Interest. .......................................................32

      1.    The Standard of Review Is Comparable to the
            "Rational Basis" Test. ......................................................33

            a.    Where Private Contracts Are Impaired By
                  State Action, Courts Ask Only Whether the
                  Action Is a Legitimate Exercise of the
                  State's Police Powers. ..........................................33

            b.    No "Less Deferential" Standard of Scrutiny
                  Applies Here, Where the Commonwealth's
                  Interests Were Not Economic. ...........................36

      2.    Even If Some "Less Deferential" Standard of
            Review Applies, the Complaint Did Not Plausibly
            Allege That the Executive Order Would Not
            Survive Such Review. ......................................................39

IV.    The District Court Correctly Dismissed Counts Two and Three
       Because the Complaint States No Plausible Claim for a
       Violation of MCOFU Members' Substantive Due Process
       Rights. .....................................................................................41

      A.    Numerous Courts Have Upheld Governmental
            Vaccination Requirements, As Required By *Jacobson*. ...........41

      B.    The District Court Properly Applied the Substantive Due
            Process Framework in Dismissing MCOFU's Claim. .............45

            1.    The Complaint Identifies No "Fundamental
                  Right." ...........................................................................46

                  a.    The Supreme Court Has Not Recognized
                        Any Broad "Fundamental Right" to Refuse
                        Medical Treatment. .............................................46

                  b.    Property Rights Are Not "Fundamental." ...........48

iii

2.      Plaintiffs Allege No Plausible Claim that the
        Executive Order Is Unsupported by a Rational
        Basis.................................................................................50

V.      Plaintiffs Have Waived Their Appeal from Dismissal of Count
        Four, Which Was Required By the Eleventh Amendment. ................51

CONCLUSION ......................................................................................52

CERTIFICATE OF COMPLIANCE WITH RULE 32 ..........................................53

CERTIFICATE OF SERVICE ................................................................53

ADDENDUM ............................................................................ADD.001

# TABLE OF AUTHORITIES

## Cases

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ......................... 18, 31

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30 (1st Cir. 2001) ...................................................................... 5

*America's Frontline Doctors v. Wilcox*, No. 21-1243, 2021 WL 4546923 (C.D. Cal. 2021) ................................................................ 43

*Andre-Rodney v. Hochul*, No. 21-cv-1053, 2022 WL 3027094 (N.D.N.Y. Aug. 1, 2022) ......................................................... 44, 50

*Baptiste v. Kennealy*, 490 F. Supp.3d 353, 385 (D. Mass. 2020) ........................... 35

*Baltimore Teachers Union, Am . Fed. Teachers Local 340, AFL-CIO v. Baltimore*, 6 F.3d 1012 (4th Cir. 1993) ............................... 31, 39

*Beaupre v. Seacoast Sales, Inc.*, 507 F.Supp.3d 353 (D. Mass. 2020) ............................................................................. 28

*Brox v. Woods Hole*, 509 F.Supp.3d 359 (D. Mass. 2022) ..................................... 44

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ................... 28, 32, 39

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63 (1st Cir. 2021) ................................................................. 5

*Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732 (7th Cir. 1987) ............................................................... 34

*Children's Health Defense v. Rutgers*, No. 21-15333, 2021 WL 4398743 (D.N.J. 2021) ................................................................. 43

*City of Lynn v. Labor Relations Comm'n*, 43 Mass.App.Ct. 172, 178, 681 N.E.2d 1234, 1238 (1997) ............................................. 23

*City of Worcester v. Labor Rel. Comm'n*, 438 Mass. 177, 180, 779 N.E.2d 630 (2002) ....................................................................20, 22, 24

*Conservation Comm'n of Falmouth v. Pacheco*, 49 Mass. App. Ct. 737, 733 N.E.2d 127 (2000) ...................................................22

*Crosby v. City of Gastonia*, 635 F.3d 634 (6th Cir. 2011) .......................................3

*Cruzan v. Director Mo. Dep't of Health*, 497 U.S. 261 (1990)..................44, 46, 47

*Cutler v. Dep't. of Health and Human Servs.*, 23 F.Appx. 12 (1st Cir. 2001)................................................................................49

*Dagi v. Airlines, Inc.*, 961 F.3d 22 (1st Cir. 2020) .................................................15

*DeKalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956 (11th Cir. 1997)......................................................................................48

*Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13 (1st Cir. 2006) .....................................51

*Doe v. San Diego Unified Sch. Dist.*, 19 F. 4th 1173 (9th Cir. 2021).........................................................................................43

*Doe #1-#14 v. Austin*, 572 F. Supp. 3d 1224 (N.D. Fla. 2021) ..............................50

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ........................................................43

*Doroz v. Delorio's Foods, Inc.*, 437 F.Supp.3d 140 (N.D.N.Y. 2006) .....................................................................................6

*Elliott v. Board of Sch. Trs. of Madison Consol. Schs.*, 876 F.3d 926 (7th Cir. 2017) ...............................................................2

*Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983)..........................................................................14, 17

*Exxon Corp. v. Eagerton*, 462 U.S. 176 (1983)......................................................31

vi

*Feingold v. John Hancock Life Ins. Co.*, 753 F.3d 55 (1st Cir. 2014) .................................................................................. 16

*Flemming v. Nestor*, 363 U.S. 603 (1960) ............................................... 35

*Global Naps, Inc. v. Massachusetts Dep't of Telecomm. & Energy*, 427 F.3d 34 (1st Cir. 2005) ........................................... 22

*Gold v. Sandoval*, No. 3:21-CV-00480, 2021 WL 5762190 (D. Nev. 2021) ....................................................................... 43

*Harris v. Univ. of Mass., Lowell*, 557 F.Supp.3d 302 (D. Mass.) ......................... 43

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) ............................. 2

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) .......................... 24, 34

*Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999) ................................................................. 29, 33, 37

*Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248 (7th Cir. 1996) .......................................................................... 27

*Irizarry v. United States*, 427 F.3d 76 (1st Cir. 2005) ...................................... 15, 16

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ............................................ *passim*

*Johnson v. Brown*, 567 F.Supp.3d 1230 (D. Or. 2021) ........................................ 43

*Kaminski v. Coulter*, 865 F.3d 339 (6th Cir. 2017) ......................................... 2, 17

*Kheriaty v. Regents of Univ. of Cal.*, No. 21-01367, 2021 WL 4714664 (C.D. Ca. Sept. 29, 2021) ............................................ 48

*Klaassen v. Trustees of Indiana Univ.* 7 F.4th 592 (7th Cir. 2021) .................................................................................. 43, 44

*LCM Enterprises, Inc. v. Dartmouth*, 14 F.3d 675 (1st Cir. 1994) .................................................................................. 46

*Legaretta v. Macias*, 21-cv-179, 2022 WL 1443014 (D.N.M. May 6, 2022) ............................................................................49, 50

*Local 346 Int'l Bhd. of Police Officers v. Labor Relations Comm'n*, 391 Mass. 429, 462 N.E.2d 96 (Mass. 1984) ..........................20, 24

*Local Div. 589, Amalgamated Transit Union v. Commonwealth*, 666 F.2d 618 (1st Cir. 1981)...............................................17, 18, 34

*Maniscalco v. New York City Dep't of Educ.*, 563 F. Supp. 3d 33 (E.D.N.Y. 2021) ............................................................49

*McInnis-Misenor v. Maine Med. Center*, 319 F.3d 63 (1st Cir. 2003) ................................................................................3, 26

*Medeiros v. Vincent*, 431 F.3d 25 (1st Cir. 2005).....................................46

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021)....................................35

*Messina v. College of New Jersey*, 566 F.Supp.3d 236 (D.N.J. 2021) .................................................................................43

*Neitzke v. Williams*, 490 U.S. 319 (1989)...............................................16

*Norris v. Stanley*, 567 F.Supp.3d 818 (W.D. Mich. 2021) .........................43, 49, 50

*O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40 (1st Cir. 1998) ................................................................................52

*Parker v. Wakelin*, 123 F.3d 1 (1st Cir. 1997).......................................17, 18, 19, 21

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)................................................................................51

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015)....................................42

*Prince v. Massachusetts*, 321 U.S. 158 (1944).......................................42

*Pure Wafer Inc. v. City of Prescott*, 845 F.3d 943 (9th Cir. 2017) ...................................................................................17, 26

*Raich v. Gonzales*, 500 F.3d 850 (9th Cir. 2007) .....................................................47

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017)......................................................3, 26

*Redondo Const. Corp. v. Izquierdo*, 662 F.3d 42 (1st Cir. 2011)........................3, 17

*Reed v. Zipcar*, 527 F.Appx. 20 (1st Cir. 2013) ......................................................16

*Rodio v. R.J. Reynolds Tobacco Co.*, 416 F.Supp.2d 224 (D. Mass. 2006)....................................................................................................28

*School Comm. of Hanover v. Curry*, 3 Mass.App.Ct. 151, 158, 325 N.E.2d 282, 287 (1975) ......................................................................23, 24

*SMA Life Assur. Co. v. Sachez-Pica*, 960 F.2d 274 (1st Cir. 1992) ....................................................................................................................22

*Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021) ..........................................................................................50

*Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) .............................................................................................2

*Sparkle Hill, Inc. v. Interstate Mat. Corp.*, 788 F.3d 25 (1st Cir. 2015) .............................................................................................49, 50, 51

*Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54 (2d Cir. 2020) ...............................................................................................*passim*

*Sveen v. Melin*, 138 S.Ct. 1815, 1822 (2018) ...................................................*passim*

*Town of Burlington v. Labor Relations Comm'n.*, 390 Mass. 157, 164, 454 N.E.2d 465, 469 (1983) .........................................................23

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315 (1st Cir. 2008)...................................................................................5

*Troogstad v. City of Chicago*, 571 F. Supp. 3d 901 (N.D. Ill. 2021) ..................................................................43, 44, 48

*United Auto Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37 (1st Cir. 2011) ...............................................................20, 40

*United States v. Utah Constr. & Mining Co.,* 384 U.S. 394 (1966)............................................................................................22

*United States Trs. Co. of New York v. New Jersey*, 431 U.S. 1 (1977)...............................................................20, 24, 36, 37, 38

*United Steel Paper & Forestry Rubber Mfg. Allied Ind. & Serv. Workers In'l. Union v. Government of Virgin Islands*, 842 F.3d 201 (3rd Cir. 2016)....................................................36, 39

*University of Hawai'i Prof. Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999) ...............................................................36

*University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986) .................................22

*V.D. v. State of New York*, 403 F.Supp.3d 76 (E.D.N.Y. 2019) ..............................42

*W.B. v. Crossroads Academy-Central Street*, No. 4:19-cv-00682, 2019 WL 6257963 (W.D. Mo. 2019)...................................................42

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..................................44, 46, 47, 48

*Watters v. Board of Sch. Dirs. of Scranton*, 975 F.3d 406 (3rd Cir. 2020) ............................................................................................2

*We the Patriots USA, Inc. v. Hochul*, 17 F. 4th 266 (2d Cir. 2021) ...............................................................43, 44, 45

*Whitlow v. California,* 203 F.Supp.3d 1079 (S.D. Cal. 2016)................................42

*Wise v. Inslee*, 2:21-CV-0288, 2022 WL 1243662 (E.D. Wash. April 27, 2022)..........................................................40, 45

*Workman v. Mingo Cnty. Bd. of Educ*, 419 F. App'x 348 (4th Cir. 2011) .................................................................42

*Zogenix, Inc. v. Baker*, 2015 WL 1206354 (D. Mass. 2015) ...................................35

*Zucht v. King*, 260 U.S. 174 (1922) .........................................................42

## **Federal Statutes**

28 U.S.C. §1367 .........................................................................3

42 U.S.C. §1983 .........................................................................2

## **State Statutes**

Mass.Gen.L. c. 27, §2 ..................................................................30

Mass.Gen.L. c. 150E, §1 ................................................................4

Mass.Gen.L. c. 150E, §2 ...............................................................19

Mass.Gen.L. c. 150E, §4 ...............................................................19

Mass.Gen.L. c. 150E, §6 ...............................................................19

Mass.Gen.L. c. 150E, §10 ..............................................................20

Mass.Gen.L. c. 150E, §11 .............................................................9, 22

## **Constitutional Provisions**

U.S. Const., art. I, §10, cl. 1 ........................................................17

## **Rules and Regulations**

Fed.R.Civ.P. 12(b)(1)...................................................................................3

Fed.R.Civ.P. 12(b)(6)........................................................................3, 15, 16

456 Code Mass. Reg. §15.01, *et seq.* .......................................................8

456 Code Mass. Reg. §15.05 .................................................................8, 22

## **INTRODUCTION**

In August 2021, shortly after several vaccines against the novel coronavirus known as COVID-19 became widely available, then-Governor Charles D. Baker issued Executive Order 595 (the "Executive Order" or the "EO"). The Executive Order required employees of the Commonwealth's executive branch to become vaccinated against COVID-19 as a condition of their employment, unless they received a medical or religious exemption. Four correction officers ("COs") employed by the Commonwealth's Department of Correction ("DOC") and their labor union, the Massachusetts Correction Officers Federated Union ("MCOFU"), sued Governor Baker and the Commissioner of the DOC in an attempt to halt enforcement of the EO against Massachusetts COs. The Plaintiffs claimed that the EO violated the United States Constitution's Contracts Clause and violated their substantive due process rights under the Fourteenth Amendment.[1]

In October 2021, the District Court denied the Plaintiffs' motion for preliminary injunction. In September 2022, the District Court dismissed the Plaintiffs' Complaint in its entirety. At some point, three of the four individually named Plaintiffs chose to become vaccinated against COVID-19 and retain their

---

[1] In Count Four of their Complaint, the Plaintiffs also alleged that the EO was *ultra vires* under Massachusetts law. The District Court dismissed that count, finding that it was barred by the Eleventh Amendment. Plaintiffs have waived argument on that count in this Court. *See infra* Argument, Part V.

employment as COs. The fourth of the individual Plaintiffs, together with the union, brought this appeal from the District Court's Order of Dismissal. For the reasons set forth herein, the District Court correctly concluded that the Plaintiffs' Complaint failed to plausibly allege a violation of either the Contracts Clause or the Plaintiffs' substantive due process rights. Because the EO easily passes constitutional muster as a matter of law, even assuming all facts asserted in the Complaint to be true, the District Court's Order should be affirmed.

## JURISDICTIONAL STATEMENT

The Defendants agree with the Plaintiffs' Jurisdictional Statement except in two respects. First, the Defendants do not admit that jurisdiction existed in the District Court pursuant to 42 U.S.C. §1983 over the Plaintiffs' Count One because the Court of Appeals for the Sixth Circuit has treated the question whether a Contracts Clause claim is available under §1983 as jurisdictional, holding that "an alleged Contract Clause violation cannot give rise to a cause of action under §1983."[2] *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017). Here, no

---

[2] In contrast, the Ninth Circuit has held that a deprivation of the right "not to have a State, or a political subdivision thereof, impair its obligations of contract" may "give rise to a cause of action under section 1983." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). Other Courts of Appeals have acknowledged a split of opinion on this issue. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 727 (8th Cir. 2022); *Watters v. Board of Sch. Dirs. of Scranton*, 975 F.3d 406, 413 & n.2 (3rd Cir. 2020); *Elliott v. Board of Sch.*

(footnote continued)

question presented turns on whether dismissal of the Plaintiffs' Contracts Clause

claim should have been ordered pursuant to Fed.R.Civ.P. 12(b)(1) or 12(b)(6), and

the District Court's dismissal of Count One should be affirmed regardless of the

basis for dismissal.[3]  *See Crosby*, 635 F.3d at 643 (affirming dismissal under

either Rule 12(b)(1) or Rule 12(b)(6) where "the end result is the same").

Second, in response to un-pleaded assertions set forth in the Brief of

Plaintiffs-Appellants filed in this Court ("Pl.Br.") and in Plaintiffs' Opposition to

Defendants' Motion to Dismiss and Memorandum of Reasons (Dckt. No. 37)

("Pl.Mem.Opp.MTD"), the Defendants assert that the District Court lacked Article

III jurisdiction over the Plaintiffs' Contracts Clause claim insofar as that claim

depends upon hypothetical events that have not occurred.  *See Reddy v. Foster*, 845

F.3d 493, 500, 501, 505 (1st Cir. 2017) (claim related to contingent future events

or events that may never occur was unripe); *McInnis-Misenor v. Maine Med.*

---

*Teachers of Madison Consol. Schs.*, 876 F.3d 926, 931-32 (7th Cir. 2017); *Crosby v. City of Gastonia*, 635 F.3d 634, 642-43 (4th Cir. 2011).

[3]  In affirming a grant of summary judgment resulting in dismissal of a Contracts Clause claim, the First Circuit cited *Crosby* with approval.  *See Redondo Const. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011).  There, the Court indicated *sub silentio* that the District Court had original jurisdiction over the Contracts Clause claim by affirming the exercise of supplemental jurisdiction over the remaining claims.  *Id.* at 49-50; *see also Crosby*, 635 F.3d at 644; 28 U.S.C. § 1367(a) ("original jurisdiction" over at least one claim required for exercise of supplemental jurisdiction).

*Center*, 319 F.3d 63, 70 (1st Cir. 2003) (ripeness doctrine prevents court

engagement in "abstract disagreements."

## <u>ISSUES PRESENTED</u>

1.     Whether the Plaintiffs' Complaint plausibly claims a violation of the

Contracts Clause by alleging facts that could demonstrate:

     a.     that the EO "impaired" the Commonwealth's contractual

obligations under a collective bargaining agreement (hereinafter, the

"CBA") between, on the one hand, the Commonwealth's Executive Office

of Administration and Finance ("A&F") through its Human Resources

Division ("HRD")[4] and, on the other hand, MCOFU; and/or

     b.     that, to the extent the Executive Order "impaired" the

Commonwealth's contractual obligations under the CBA, any such

impairment was "substantial;" and/or

     c.     that, assuming *arguendo* that the Executive Order "substantially

impaired" the Commonwealth's contractual obligations under the CBA, the

enforcement of the EO with respect to employees working in the State's

correctional facilities was not an "appropriate" and "reasonable" way to

---

[4]  A&F is the statutory employer of MCOFU's members under Mass.Gen.L.
c. 150E, §1.  HRD is A&F's designee for collective bargaining.

advance a significant and legitimate public interest during the COVID-19 pandemic.

2.     Whether the Complaint plausibly states a claim that enforcement of the Executive Order violated MCOFU's members' substantive due process rights.

3.     Whether the Plaintiffs have waived any appeal from dismissal of Count Four, and whether Count Four was properly dismissed in any event.

## STATEMENT OF THE CASE

### Relevant Facts

#### 1.     The Parties

MCOFU is the exclusive collective bargaining agent for COs employed by the DOC under the Massachusetts statute governing collective bargaining in the public employment setting, Mass.Gen.L. c. 150E.  *See* Appendix ("App.") at 13-14, ¶¶1, 3.[5]  Plaintiffs Michael Mosher, Zac Gustafson, Denina Dunn, and Angela

---

[5]  The facts asserted herein are drawn from the allegations of the Complaint, which were assumed by the District Court to be true for purposes of the Defendants' motion to dismiss.  *See* App. at 301; *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021) (facts asserted in Complaint taken as true for purposes of motion to dismiss).  They are also taken from attachments to the Complaint.  *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (exhibits attached to complaint considered part of pleading for all purposes).  Additionally, some undisputed facts recited herein are taken from materials outside the pleadings that were before the District Court, and as to which the District Court could (and this Court can) take judicial notice.  *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (court may consider on R. 12(b)(6) motion "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to
(footnote continued)

Pucci were COs employed by the DOC and members of MCOFU at the time their Complaint was filed. *Id.* at 14-15, ¶¶3-7. Mosher's employment with the DOC has since been terminated; Gustafson, Dunn, and Pucci remain employed with the DOC. *See* Pl.Br. at 17, n.5.

### 2.    **The Executive Order**

The Executive Order, issued on August 19, 2021, required MCOFU's members to demonstrate that they had been vaccinated against COVID-19 by October 17, 2021, unless they obtained an exemption for "medical disability" or "sincerely held religious belief." *See* App. at 13, ¶1; 19, ¶22; 165-167.

### 3.    **The Collective Bargaining Agreement**

As A&F's designee, HRD, is a party to MCOFU's CBA with the Commonwealth, *see* App. at 38.[6] The CBA contains a requirement that the employment of MCOFU members may not be terminated without cause. App. at 16, ¶¶11-12. The CBA also affords covered employees certain process for challenging adverse employment actions. *Id.* at 16, ¶13; 17, ¶15. At the time the

---

plaintiffs' claim") (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)); *see also Doroz v. Delorio's Foods, Inc.*, 437 F.Supp.3d 140, 155 n.3 (N.D.N.Y. 2006) (court may take judicial notice of records of state administrative proceedings). Finally, the Defendants recite herein certain factual admissions set forth in the Pl.Mem.Opp.MTD (Dckt. No. 37) and Pl.Br.

[6] The CBA had expired on June 30, 2021, but its terms remained in effect at all times relevant to this appeal pursuant to an "evergreen clause." App. at 15, ¶9; 113, Art. 34.

Complaint was filed, the four individually named Plaintiffs were all "tenured employees" within the meaning of the Commonwealth's civil service law, Mass.G.L. c. 31, and, thus, they each had a statutory right to a "just cause" proceeding before the Commonwealth's Civil Service Commission in the event their employment was terminated. *Id.* at 17, ¶16.

The CBA also contains numerous provisions related to the possibility of infectious diseases entering Massachusetts correctional facilities and the obligations of COs in response to such threats. Specifically, Article 32, entitled "Contagious Disease," requires testing of COs for contagious diseases under specified circumstances, including testing for tuberculosis. *See* App. at 111-112. If there is an outbreak of contagious disease and a MCOFU member has tested positive for the disease and needs medication, that member "shall have such medication provided by the Department [of Correction]."[7] *Id.* at 112, Art. 32, §6.

Additionally, the CBA states that "[a]ny employee who tests positive for any communicable disease is expected to and must follow all recommended health procedures, *i.e.*, the taking of medication, proper testing, etc., which are provided by the [DOC] and [Department of Public Health]." App. at 112, ¶9. Finally, the CBA states: "Where credible evidence exists (as determined by the appropriate

---

[7] The Plaintiffs admit that COVID-19 vaccinations are "medication and/or medical treatment." App. at 19, ¶23.

state Agency or Department) of a communicable disease (*e.g.*, Tuberculos[i]s, Hepatitis B, etc.), the Employer shall forthwith make every reasonable effort to provide all employees coming into contact with the afflicted person(s) and/or environment, with appropriate training and advice."[8]  *Id.* at 93, Art. 20, §1.C.

### 4.    **MCOFU's Prohibited Practices Charge**

On August 23, 2021, MCOFU demanded that the Commonwealth bargain over the decision to require vaccination of executive department employees.  *See* App. at 20, ¶ 25; 169.  The Commonwealth declined to bargain over that decision but offered to bargain over its impacts.  *Id.* at 20, ¶ 25; 169-174.  On September 14, 2021, MCOFU filed an unfair labor practice charge with the Commonwealth's Department of Labor Relations ("DLR"), in which it claimed that the Commonwealth had violated its obligation to bargain over the decision to issue the Executive Order.  *See* App. at 258-262, 279, 281.  On November 3, 2021, the DLR issued a Complaint of Prohibited Practice and Partial Dismissal.[9]  *See id.* at 279-

---

[8]  In addition to provisions related to infectious disease, the CBA contains various restrictions on COs' personal choices related to health and grooming.  *See* App. at 108, Art. 29; 108-110, Art. 30; 121-122; 133.

[9]  The procedure for litigating prohibited practice charges before the DLR is set forth in 456 Code Mass. Reg. §15.01, *et seq.*  After a charge is filed, the matter may be assigned to an investigator.  *Id.* at §15.05(1).  The DLR Complaint and Dismissal issued by the investigator in MCOFU's case (App. 279-285) is a hybrid document; it constitutes a Complaint as to a portion of MCOFU's charge and a dismissal as to the remaining portion.

285. Through that document, a DLR investigator partially dismissed MCOFU's prohibited practice charge on the ground that the Commonwealth was not required to bargain over the decision to require COs to obtain vaccination against COVID-19.[10] *See id.* at 281; 283-284; 300. MCOFU was entitled to appeal from the "partial dismissal" portion of the investigator's decision by filing a request for review with the Commonwealth Employee Relations Board ("CERB") within ten days of receipt of the document, *see* Mass.Gen.L. c. 150E, §11(e), but MCOFU did not do so.[11]

### 5. The Arbitration Process

In response to the Defendants' Motion to Dismiss ("MTD"), the Plaintiffs alleged (for the first time) that a "private dispute resolution process" was "underway," which could result in a determination by one or more arbitrators that adoption and enforcement of the EO against MCOFU's members amounted to a "contract[ual] breach[]" of the CBA. *See* Pl.Mem.Opp.MTD at 3. The Plaintiffs went on to explain that members of unions having collective bargaining agreements with agencies of the Commonwealth must resolve disputes arising

---

[10] Subsequent to issuance of the partial dismissal in MCOFU's prohibited practices case, a different DLR investigator reached the same conclusion in a matter brought by a different union. *See* App. at 287-296.

[11] Further, MCOFU voluntarily withdrew the portion of its prohibited practices charge that resulted in issuance of a Complaint in May 2022, and the DLR case initiated by MCOFU was then closed.

from those agreements through a private grievance/arbitration process. *Id.* at 4; *see also id.* at 5 (including dispute resolution terms culminating in binding arbitration).

The Plaintiffs further claimed that "[s]ince the [EO] was implemented by DOC, some MCOFU-represented COs have been disciplined, and some have been terminated from employment, because of their refusal to take the vaccine." *See* Pl.Mem.Opp.MTD at 7. Further, "[i]n each instance, MCOFU has filed grievances challenging their terminations as contract violations." *Id.* Additionally, "those grievances are being processed in the lower level of the grievance process and it is anticipated that they will be submitted to arbitration."[12] *Id.* As of the date of the Plaintiffs' response to Defendants' MTD, the grievances MCOFU had filed on behalf its members in connection with the EO remained pending and had not yet been submitted to arbitration. *Id.* at 8.

Additionally, by the time MCOFU filed its response to the Motion to Dismiss, Plaintiffs Gustafson, Dunn, and Pucci had all opted to receive COVID-19 vaccination and retain their employment. *See* Pl.Mem.Opp.MTD at 8. Only Plaintiff-Appellant Mosher had elected against receiving the COVID-19

---

[12] The Plaintiffs also claimed that MCOFU had filed a "class-action" grievance on behalf of the entire bargaining unit that includes COs. *Id.* at 7. That class-action grievance, according to the Plaintiffs, asserts that enforcement of the EO against MCOFU's members violated Articles 2 and 32 of the CBA, and exceeded the rights reserved to management under Article 25 of the CBA. *Id.* at 7-8, n.17.

vaccination; his employment as a CO had been terminated as a result. *Id.*
MCOFU filed a grievance on Mosher's behalf. *Id.*

After asserting the foregoing facts, the Plaintiffs speculated that: (i) one or
more arbitrators may eventually determine that the Commonwealth and/or HRD
breached the CBA by requiring COs to obtain COVID-19 vaccination and
imposing adverse employment consequences as a result of their failure to do so,
and (ii) the Commonwealth might argue that the EO renders unenforceable any
order for relief issued by an arbitrator — thereby leaving any MCOFU member
who prevails at arbitration without a remedy.[13] *See* Pl.Mem.Opp.MTD at 14; *see
also* Pl.Br. at 36-37. Thus, the Plaintiffs argued, "unless the Commonwealth/DOC
are prepared to abide by the arbitrator's ordered remedy for the contract violations,
the EO will have 'slammed the door' to relief for the DOC's breaches and thus
impaired the obligation of contract in the constitutionally relevant manner."
Pl.Mem.Opp.MTD at 14; *see also* Pl.Br. at 37.

## Relevant Procedural History

Plaintiffs' Complaint, filed in September 2021, sought: (i) a declaration that
the EO is unconstitutional and (ii) an injunction against its enforcement. *See* App.

---

[13] According to the Plaintiffs, "[t]ypically, terminations that are deemed not for
just cause are remedied by orders of reinstatement and backpay." Pl.Br. at 13.

at 30-31.  In support of those requests, the Complaint asserted four legal theories: (i) violation of the Contracts Clause (Count One), *id.* at 22-26; (ii) violation of MCOFU members' substantive due process rights by unlawful infringement upon MCOFU members' liberty interests (Count Two), *id.* at 26-28; (iii) violation of MCOFU members' substantive due process rights by unlawful infringement upon MCOFU's members' property interests (Count Three), *id.* at 29-30; and (iv) that issuance of the EO was not authorized by the Massachusetts Constitution (Count Four), *id.* at 30.  The Court denied the Plaintiffs' motion for a preliminary injunction ("MPI") on October 14, 2021.  *See* App. at 263-278.

On December 20, 2021, the Defendants filed their MTD (Dckt. No. 33), together with a memorandum in support (Dckt. No. 34).  The Plaintiffs opposed the MTD, filing their opposition on January 24, 2022 (Dckt. No. 37).  After obtaining leave from the District Court (Dckt. No. 40), the Defendants filed a reply on April 5, 2022 (Dckt. No. 41).

The District Court held oral argument on the Defendants' Motion on June 23, 2022.  *See* App. at 11.  On September 19, 2022, the District Court entered an Order of Dismissal together with a Memorandum of Decision and Order (Dckt. Nos. 46 & 47).  *See* App. at 297-305.  Plaintiffs Mosher and MCOFU filed a Notice of Appeal on October 3, 2022.  *See id.* at 306.

12

**Rulings Presented for Review**

The District Court ordered dismissal on the ground that none of the

Plaintiffs' four counts stated a claim upon which relief could be granted.  *See*

Fed.R.Civ.P. 12(b)(6); *see also* App. at 298, 305.  In ruling on Plaintiffs' Contracts

Clause claim (Count One), the District Court concluded that the Plaintiffs had not

plausibly alleged that the Executive Order "impaired" or "substantially impaired"

the Commonwealth's obligations under the CBA within the meaning of those

words as established by Contracts Clause jurisprudence.  App. at 302.  In ruling on

the Plaintiffs' substantive due process claims (Counts Two and Three), the District

Court concluded that: (i) the EO is subject only to "rational basis review," since the

Plaintiffs did not plausibly allege infringement of any fundamental right; and (ii)

the EO was rationally related to the legitimate (if not compelling) government

interest in stemming the spread of COVID-19.  App. at 304-305.  Finally, the

District Court concluded that Count Four was barred by the Eleventh Amendment.

App. at 305.

**SUMMARY OF THE ARGUMENT**

**Contracts Clause**

The District Court correctly concluded that the Plaintiffs' Contracts Clause

claim did not plausibly allege that the EO impaired any obligation of contract for

two reasons.  First, because the decision to require vaccination of COs in the midst

of a global pandemic was not a proper subject of collective bargaining and was,

13

instead, reserved to the discretion of the COs' public employer under Massachusetts law, the EO cannot possibly have impaired any obligation existing under the CBA.  Second, to the extent MCOFU and Mosher allege that the EO will deprive MCOFU's members of remedies they otherwise would have through grievance and arbitration, their un-pleaded allegations are entirely speculative and hypothetical.  The District Court also correctly dismissed the Contracts Clause claim on the additional ground that, even if the EO impaired any of the Commonwealth's obligations under the CBA, the Complaint did not plausibly allege that any such impairment was "substantial."  And, finally, had the District Court reached the question whether the Plaintiffs plausibly alleged that the EO was not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" *Sveen v. Melin*, 138 S.Ct. 1815, 1822 (2018) (quoting *Energy Res. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)), that question would easily have been answered in the negative.[14]

---

[14]  Although the District Court did not reach this last prong of the Contracts Clause analysis in ruling on the MTD, it denied the Plaintiffs' MPI in part because: "[E]ven if Plaintiffs could show a substantial impairment of a contractual relationship, their claim under the Contracts Clause would not succeed because EO 595 is a reasonable and appropriate way to advance the significant goal of stopping the spread of COVID-19 in the state prison system."  App. at 272.

**Substantive Due Process**

The District Court also correctly concluded that the Plaintiffs did not plausibly allege any violation of MCOFU's members' substantive due process rights for several reasons. First, both persuasive and controlling precedent hold that governmental vaccination requirements do not offend substantive due process. Second, the District Court correctly applied rational basis review because the Complaint did not plausibly allege any infringement on a fundamental right. Third, the EO easily survives rational basis review, even assuming all of Plaintiffs' allegations to be true.

**State Law Claim**

To the extent MCOFU and Mosher intended to appeal from the District Court's dismissal of Count Four, they have waived that appeal by failing to make any argument about it in their opening brief. And, in any event, Count Four was properly dismissed under the Eleventh Amendment.

## ARGUMENT

### I. *De Novo* Review Applies.

A Court of Appeals conducts a *de novo* review in considering the dismissal of a Complaint pursuant to Fed.R.Civ.P. 12(b)(6). *Irizarry v. United States*, 427 F.3d 76, 77 (1st Cir. 2005). Such a review is performed "with fresh eyes and with no deference to the decision-making below," *Dagi v. Airlines, Inc.*, 961 F.3d 22, 27 (1st Cir. 2020), and while "accept[ing] the well-pleaded facts as true and draw[ing]

all inferences in favor of the Plaintiffs." *Irizarry*, 427 F.3d at 77.  Further, the

appellate court is not limited by the District Court's reasoning.  Instead, this Court

"may affirm on any basis made manifest by the record." *Id.*  Here, the District

Court's Order of Dismissal readily survives *de novo* scrutiny.

## II.    A Complaint May Be Dismissed Where Warranted as a Matter of Law.

While dismissal is appropriate where a plaintiff has failed to plead a

necessary element of their claim, it is also warranted where the plaintiff has

attempted to plead all elements, but defendant's entitlement to judgment is

apparent nonetheless.  *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule

12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of

law"), *superseded by statute on other grounds as recognized in, e.g., Lopez v.*

*Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000); *Feingold v. John Hancock Life Ins.*

*Co.*, 753 F.3d 55, 61 n.4 (1st Cir. 2014) (claim implausible where no alleged facts

impact legal question); *Reed v. Zipcar*, 527 F.Appx. 20, 22 (1st Cir. 2013)

(considering whether dismissal warranted "as a matter of law").

The Defendants agree with MCOFU and Mosher that a court should not

inquire into the sufficiency of a plaintiff's evidence in considering a Rule 12(b)(6)

motion.  *See* Pl.Br. at 22; 31.  But the District Court engaged in no such inquiry.

Instead, the District Court correctly assumed the truth of the alleged facts, drawing

all available inferences in favor of the Plaintiffs.  *See* App. at 301.

**III.** **The District Court Correctly Dismissed Count I Because the Complaint Did Not Plausibly Allege a Violation of the Contracts Clause.**

The Constitution's command that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts, U.S. Const., art. I, § 10, cl. 1, applies "only to laws with retrospective, not prospective, effect." *Local Div. 589, Amalgamated Transit Union v. Commonwealth*, 666 F.2d 618, 637 (1st Cir. 1981). And even so, "not all laws affecting pre-existing contracts violate the Clause." *Sveen*, 138 S.Ct. at 1821; *see also Parker v. Wakelin*, 123 F.3d 1, 4 (1st Cir. 1997). Importantly, a Contracts Clause claim does not lie where a government entity has merely "breached" a contract, as distinct from having impaired its own contractual obligations. *See Redondo*, 662 F.3d at 48; *Kaminski*, 865 F.3d at 345. This "distinction is crucial, not least because conflating the two concepts would risk making a federal constitutional case out of even the most garden variety public contract dispute, transforming the Contract Clause into a font of state contract law." *Pure Wafer Inc. v. City of Prescott*, 845 F.3d 943, 951 (9th Cir. 2017).

Further, "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"[15] *Energy Res. Grp.,* 459 U.S. at 410

---

[15] Courts have interchangeably used "Contracts Clause" and "Contract Clause." *Compare Parker*, 123 F.3d at 2 (considering whether legislative amendments violate the "Contract Clause") *with Redondo*, 662 F.3d at 43-44 (considering

(footnote continued)

(quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978) ("literalism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection") (quoting *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934)).  Accordingly, "at least since the early 1930's," courts have struck down state laws pursuant to the Contracts Clause "only infrequently."  *Local Div. 589*, 666 F.2d at 639.

A plausible Contracts Clause claim asserts facts that, if true, show a state law (or, in this case, the Executive Order):[16]  (1) "operate[s] as a substantial impairment of a contractual relationship," *Sveen*, 138 S.Ct. at 1821-22 (quoting *Allied Structural Steel*, 438 U.S. at 244), and (2) is not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" *id.* at 1822 (quoting *Energy Res. Grp.*, 459 U.S. at 411-12); *Parker*, 123 F.3d at 4-5.

---

whether application of statute violated the "Contracts Clause.")  The phrase "Contracts Clause" is used herein.

[16]  Without waiver of the right to argue otherwise in another context, the Defendants have assumed throughout this litigation that the EO is "legislative" for Contracts Clause purposes.  *See, e.g.*, *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 61 (2d Cir. 2020) (explaining distinction between "legislative" and "administrative" acts); *see also* Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (Dckt. No. 18) ("Mem.Opp.PI") at n.12.

A.    **The Executive Order Did Not "Substantially Impair" the CBA.**

The first of the *Sveen* inquiries, *i.e.*, whether the EO "substantially impaired"

the CBA, 138 S.Ct. at 1821-22, can be broken into three parts:  "whether there is a

contractual relationship, whether a change in law impairs that contractual

relationship, and whether the impairment is substantial."  *Parker*, 123 F.3d at 5

(quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

1.    **The Commonwealth's Contractual Relationship with MCOFU Is Subject to the State's Reservation to Itself of Certain Core Managerial Decisions.**

Undoubtedly, the CBA is a contractual relationship between A&F and

MCOFU.  *See* App. at 38.  Importantly, however, that relationship exists within a

statutory context by which the Commonwealth has reserved certain rights to itself,

notwithstanding its consent to engage in collective bargaining.

By statute, a Massachusetts public employer (such as A&F) must engage in

collective bargaining negotiations with an entity (such as MCOFU) that has been

designated as the exclusive representative of a group of employees organized under

Mass.Gen.L. c. 150E, §2.  *See* Mass.Gen.L. c. 150E, §4.  Such an employer shall

negotiate in good faith "with respect to wages, hours, standards or productivity and

performance, and any other terms and conditions of employment."  Mass.Gen.L. c.

150E, §6.  Further, it is a "prohibited practice" for a Massachusetts public

employer to "[r]efuse to bargain collectively in good faith with the exclusive

representative as required in section 6 [of Mass.Gen.L. c. 150E][.]"  Mass.Gen.L. c. 150E, §10(a)(5).

Under case law interpreting Mass.Gen.L. c. 150E, however, certain types of managerial decisions are not proper subjects of collective bargaining and are, thus, reserved to the public employer's discretion.  *See Local 346 Int'l Bhd. of Police Officers v. Labor Relations Comm'n*, 391 Mass. 429, 437-438, 462 N.E.2d 96, 101-102 (Mass. 1984); *City of Worcester v. Labor Rel. Comm'n*, 438 Mass. 177, 180, 779 N.E.2d 630, 633-634 (Mass. 2002).  Specifically, "in instances where a negotiation requirement would unduly impinge on a public employer's freedom to perform its public functions, Mass.Gen.L. c. 150E, §6, does not mandate bargaining over a decision directly affecting the employment relationship."[17] *Local 346 Int'l*, 391 Mass. at 437, 462 N.E.2d at 102.  This reservation of managerial prerogative is consistent with the "'essential attributes of sovereign power'" that are "necessarily reserved by the States to safeguard the welfare of their citizens," and which must be reconciled with the Contracts Clause where a state's own contracts are affected by legislative action.  *United States Trs. Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977) (citation omitted); *see also United*

---

[17]  This inquiry identifies subjects that "must be reserved to the sole discretion of the public employer so as to preserve the intended role of the governmental agency and its accountability in the political process."  *Worcester*, 438 Mass. at 181, 779 N.E.2d at 634.

*Auto. Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011); *Sullivan*, 959 F.3d at 63 ("the state may not contract away its power to govern in the public interest"). As explained *infra*, this case involves just such a core managerial prerogative.

### 2. The Executive Order Did Not Impair the Commonwealth's Contractual Obligations Under the CBA *At All*.

The next of the three inquiries comprising the "substantial impairment" prong of the *Sveen* test is whether an "impairment" of contractual obligation has occurred. *See Parker*, 123 F.3d at 5. Here, that question should be answered in the negative for two reasons. First, the decision to require COs to obtain COVID-19 vaccination was in the category of matters reserved to the discretion of management, and thus, it was *extra*-contractual. Second, the EO did not deprive (and has not deprived) MCOFU or any of its members of any remedy otherwise available to them under the CBA or under Mass.Gen.L. c. 150E. That the EO did not impair the Commonwealth's obligations under the CBA *at all* is reason enough to affirm the Order of Dismissal.

### a. The Complaint Does Not Plausibly Contest that the Decision to Require Vaccination was a Managerial Prerogative Exempt from Collective Bargaining.

Two DLR investigators have already held that the Commonwealth's decision to require COVID-19 vaccination of executive branch employees was within the Commonwealth's "core managerial prerogative[s]" as employer, and,

21

thus, was exempt from collective bargaining.[18] *See* App. at 283-285 (DLR

decision in MCOFU's prohibited practices charge); 293-295 (DLR decision in

prohibited practices charge brought by another union); *see also Worcester*, 438

Mass. at 181-183, 779 N.E. at 634-636; For this reason alone, the Complaint did

not (and cannot, even with amendment) plausibly allege that the Commonwealth's

obligations under the CBA were "impaired" at all by the EO — let alone,

"substantially." *See Sveen*, 138 S.Ct. at 1824 ("Not 'every statute which affects the

---

[18]  Because MCOFU did not appeal from the DLR investigator's determination that the Commonwealth was not required to engage in "decisional" bargaining prior to issuance of the EO, the investigator's decision on that issue was final and binding. *See* Mass.Gen.L. c. 150E, §§11(e) ("Any order issued pursuant to this section shall become final and binding unless, within 10 days after notice thereof, any part requests to be heard by the [CERB]), and 11(i) (party aggrieved by CERB decision may seek judicial review at Massachusetts Appeals Court within 30 days after receipt of order); *see also* 456 Code Mass. Reg. §15.05(9).  Although a federal court may not be *required* to defer to a final decision of a state agency that has not been judicially reviewed, "the Supreme Court has expressed approval for such deference where [as here] state administrative proceedings were of an adjudicative nature." *SMA Life Assur. Co. v. Sachez-Pica*, 960 F.2d 274, 277 (1st Cir. 1992); *see also University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986) (federal courts must give same preclusive effect as would apply under state law to state agency's fact findings made while the agency was acting in a judicial capacity); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422 (1966)); *Conservation Comm'n of Falmouth v. Pacheco*, 49 Mass. App. Ct. 737, 741, 733 N.E.2d 127, 131 (2000) (failure to seek judicial review of agency order precludes litigation of claims under Massachusetts law); *cf. Global Naps, Inc. v. Massachusetts Dep't of Telecomm. & Energy*, 427 F.3d 34, 44 (1st Cir. 2005) (assuming *arguendo* that federal common law of issue preclusion applied to "unreviewed administrative agency proceeding").

value of a contract' . . . 'impair[s] its obligation.'") (quoting *Curtis v. Whitney*, 80 U.S. at 68, 70 (1871)).

Under Massachusetts law, the Legislature did not (by adopting Mass.Gen.L. c. 150E) subordinate the Commonwealth's right to make core management decisions in the interest of the public to any statutory obligation it may have to engage in collective bargaining.  *See Town of Burlington v. Labor Relations Comm'n.*, 390 Mass. 157, 164, 454 N.E.2d 465, 469 (1983) ("We have recognized the limits which public policy may impose upon the ability of a public employer to bind itself in collective bargaining."); *School Comm. of Hanover v. Curry*, 3 Mass.App.Ct. 151, 158, 325 N.E.2d 282, 287 (1975) ("[D]ecisions concerning managerial rights in the public sector are qualitatively different from those in the private sector . . . because of the necessity of safeguarding public control over such decisions.").  The reservation of state authority inherent in the Commonwealth's collective bargaining agreements exists where "the ingredient of public policy in the issue subject to dispute is so comparatively heavy that collective bargaining, and even voluntary arbitration, on the subject is, as a matter of law, to be denied effect."[19] *City of Lynn v. Labor Relations Comm'n*, 43 Mass.App.Ct. 172, 178,

---

[19]  For examples of policy decisions held to be within Massachusetts public employers' retained managerial discretion, *see, e.g., Town of Burlington*, 390 Mass. at 164, 454 N.E.2d at 469 (town's designation of persons to prosecute criminal cases in a District Court was "exclusive managerial prerogative");

(footnote continued)

681 N.E.2d 1234, 1238 (1997) (quoting *School Comm. of Boston v. Boston Teachers Union, Local 66*, 378 Mass. 65, 71, 389 N.E.2d 970 (1979)). Here, where the Legislature reserved certain managerial decisions to the Commonwealth in enacting Mass.Gen.L. c. 150E, a decision fitting within that reserved authority cannot possibly offend the Contracts Clause. Holding otherwise would turn any unilateral management decision affecting a public employer's unionized workforce into a Contracts Clause violation, impermissibly impinging on the State's sovereign power to "safeguard the welfare of [its] citizens." *U.S. Trs.*, 431 U.S. at 21. Accordingly, because the decision to require vaccination of COs was a management prerogative reserved to the Commonwealth, the Complaint did not plausibly allege that the Commonwealth impaired any of its obligations under the CBA. *See Blaisdell*, 290 U.S. 398 at 435 ("Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.").

---

*Worcester*, 438 Mass. at 184, 779 N.E.2d at 637 (city not required to bargain over decision to assign truancy enforcement duties to police officers); *Local 346 Int'l*, 391 Mass. at 429-430, 462 N.E.2d at 97 (municipality not required to negotiate with police union over decision to use polygraph examinations in investigation of criminal activity allegedly committed by police officers); *Hanover Sch. Comm.*, 3 Mass.App.Ct. at 158, 325 N.E.2d at 287 (abolishment of supervisor of music position was exclusive managerial prerogative of school committee).

    **b.**    **The Complaint Does Not Plausibly Allege that the Executive Order Deprived MCOFU Members of Any Contract Remedy.**

MCOFU and Mosher argue, however, that if any arbitrator finds that enacting and enforcing the Executive Order was, itself, a breach of the CBA, and awards one or more MCOFU members relief as a result, the Commonwealth will claim the award is unenforceable on the ground that the EO "trumps" the arbitrator's authority. *See* Pl.Brief at 36-37. MCOFU claims this possibility amounts to a Contracts Clause violation because it would deprive MCOFU's members of any remedy for an established breach of the CBA. These allegations are unavailing, however, because they are entirely hypothetical. In their brief in this Court, MCOFU and Mosher speak to what they "could plausibly establish" in an arbitration, what the Commonwealth "is free, of course, to argue," and about how the arbitrator "might . . . construe" the CBA."[20] Pl.Br. at 36. They go on to explain that an arbitrator might order relief including compensation for lost wages and benefits, and they speculate that the Commonwealth may be unwilling to abide by any such order, and may contend that the EO renders unenforceable any award issued by an arbitrator. *Id.* at 37.

But the scenario envisioned by MCOFU and Mosher is wholly speculative. Even if formally pleaded, such allegations could not plausibly support a Contracts

---

[20] These allegations are not set forth in any pleading. *See* App. at 13-31.

Clause claim because they describe events that have not occurred and may not ever

occur.  *See Reddy*, 845 F.3d at 500 (claims relating to "'contingent future events

that may not occur as anticipated, or indeed may not occur at all'" are unripe)

(quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *McInnis-Misenor*, 319

F.3d at 70 (ripeness doctrine "'prevent[s] the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements'")

(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).

In short, MCOFU and Mosher's argument only proves the Defendants' point

— the Complaint does not plausibly allege that the Commonwealth's obligations

under the CBA have been impaired *at all*, since the possibility that MCOFU's

members might be deprived of a remedy if and when a contractual breach is

established is merely hypothetical.  Because MCOFU and Mosher have not

alleged, and cannot presently allege, that: (i) a breach of the CBA has been

established in the appropriate forum, and/or that (ii) Mosher or any other MCOFU

member has been deprived of a remedy for that breach, the District Court correctly

dismissed their Contracts Clause claim.  *See Pure Wafer*, 845 F.3d at 951

(obligation of state's own contract not impaired where both parties free to obtain

remedy for breach).[21]

---

[21]  "In [Oliver Wendell] Holmes's vivid formulation, the obligation created by a
contract is an obligation to perform or pay damages for nonperformance, and if the
(footnote continued)

### 3. Even if the Executive Order Impaired Any Obligation of Contract, the Impairment Was Not "Substantial."

The third and final inquiry in the first half of the *Sveen* test is whether any impairment of existing contractual obligations caused by state action is "substantial." Thus, even if the Court were to find that MCOFU and Mosher have plausibly alleged that the Executive Order "impaired" the Commonwealth's obligations under the CBA, it should nonetheless affirm the dismissal of Count One because they have not plausibly alleged that the impairment was "substantial." To decide whether an impairment of contract is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S.Ct. at 1822.

### a. The Executive Order Did Not Undermine MCOFU's Contractual Bargain.

The first of the factors relevant to the "substantial" inquiry is whether the Executive Order "undermines the contractual bargain." *Sveen*, 138 S.Ct. at 182. Here, because the Executive Order does not affect the core terms of the CBA, it does not "undermine" the contract within the meaning of this test. Instead, issuance and implementation of the EO did not disrupt any financial terms set forth

---

second alternative remains, then, since it is an alternative, the obligation created by the contract is not impaired." *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) (internal citation omitted).

in the CBA.  As explained by the Second Circuit:  compensation terms are "the most important elements of a labor contract" and are "not only the primary inducement for employees to enter into a labor contract, but also the central provision upon which it can be said they reasonably rely." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006).  Because the EO had no impact whatsoever on the negotiated pay scale for COs, the primary inducement for MCOFU's members to ratify the CBA was left intact.

Additionally, although the EO imposed a condition of employment that could lead to a "for cause" termination if violated, it did not remove the "for cause" terms of the CBA — preserving another key feature of the agreement. Specifically, the EO did not in any way convert the MCOFU's members' position to that of at-will employees, who have no contractual rights to continued employment.  *See Beaupre v. Seacoast Sales, Inc.*, 507 F.Supp.3d 353, 361 (D. Mass. 2020) (Massachusetts at-will employees "may be terminated for any reason at any time"); *Rodio v. R.J. Reynolds Tobacco Co.*, 416 F.Supp.2d 224, 232 (D. Mass. 2006) (same).

Further, MCOFU and Mosher's arguments demonstrate that the Executive Order has had no impact whatsoever on the grievance and arbitration procedures available to MCOFU's members in the event of an adverse employment.  Instead, MCOFU and some of its members (including Mosher) are actively litigating

grievances arising from enforcement of the EO and plan to take their claims to binding arbitration.  *See* Pl.Mem.Opp.MTD at 7-8.  Because these options are unavailable to at-will employees, they go to the essence of a collective bargaining agreement.

The Executive Order also did not affect COs' general working conditions, working hours, or leave time.  Simply put, it did not deprive MCOFU or any of its members of any rights they may have under either the CBA or under Mass.Gen.L. c. 150E.  Consistent with the Commonwealth's reserved managerial prerogatives, the EO simply imposed a reasonable requirement on Commonwealth employees so as to address a genuine public health emergency.  Because the EO left intact all core terms of the CBA, it did not "undermine" any of the Commonwealth's obligations of contract.

> **b.    The Executive Order Was Consistent With MCOFU Members' "Reasonable Expectations."**

The second prong of the "substantial" test, whether the State's action "interferes with a party's reasonable expectations," *Sveen*, 138 S.Ct. at 182, is equally unhelpful to MCOFU and Mosher.  "In this inquiry, it is especially important whether the parties operated in a regulated industry," *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999), which informs whether the impairment was "foreseeable."  *Sullivan*, 959 F.3d at 64.

The state prison system is a heavily regulated environment. That reality is reflected not only by various terms set forth in the CBA but also in statutes, regulations, and DOC policies. As just one example of an extra-contractual regulation impacting MCOFU's members, COs are prohibited by statute from smoking tobacco products at all – not even on their own time, on or outside of DOC premises.[22] *See* Mass.Gen.L. c. 27, §2. Additionally, the CBA is rife with detailed terms that relate to matters such as MCOFU members' health, fitness, and grooming. *See* App. at 108-110 (Art. 29-30) (drug-testing and physical fitness provisions); 121 (Memorandum of Understanding ("MOU") regarding fitness standards); 133-134 (MOU regarding grooming and appearance requirements). The CBA also makes clear that MCOFU members will be asked to take measures to prevent contagion throughout the State's correctional facilities in the event of an outbreak of contagious disease. *See* App. at 111-112.

In short, the requirements imposed by the Executive Order do not "substantially" impair any obligations of contract here, where MCOFU's members work in a heavily regulated industry in which further regulation to deal with exigencies in the public interest was readily foreseeable at the time the contract

---

[22] For additional examples, *see* Mem.Opp.PI at 6-7.

was entered.[23]  *See Allied Structural Steel*, 438 U.S. at 250 (law affected "an area already subject to state regulation"); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 194 n.14 (1983) (Contracts Clause claim failed where "appellants operate in industries that have been subject to heavy regulation").  As the District Court correctly concluded in denying the Plaintiffs' MPI, the EO "operates as a condition of employment and not a core provision of the CBA, which does not undermine the bargaining agreement and can be seen as a reasonable and foreseeable mechanism to maintain a safe work environment."  App. at 272.

### c.    The Executive Order Did Not Prevent MCOFU's Members from Safeguarding Their Rights.

The third and final prong of the "substantiality" inquiry under *Sveen* is whether the contractual impairment "prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S.Ct. at 182.  Here, that criterion overlaps with the question whether the EO impaired any obligation under the CBA.  As already discussed, *supra*, it is plain from the facts asserted by MCOFU and Mosher that they are taking full advantage of all opportunities to vindicate and safeguard their rights under the CBA by litigating simultaneously in multiple fora — *i.e.*, in this

---

[23]  As explained by the Fourth Circuit in considering the reasonableness of a government wage reduction measure where substantial impairment of a labor contract *was* found, "[p]ublic employees . . . by definition serve the public and their expectations are necessarily defined, at least in part, by the public interest." *Baltimore Teachers Union, Am . Fed. Tchrs. Local 340, v. Baltimore*, 6 F.3d 1012, 1021 (4th Cir. 1993).

31

Court, before the DLR, and through the private grievance/arbitration process.

Thus, demonstrably, nothing contained in the EO has deprived MCOFU or Mosher

of any such opportunities.  Further, to the extent MCOFU and Mosher contend that

they will be unable to vindicate rights because of legal positions the

Commonwealth may (or may not) take in the future, their claims are

hypothetical.[24]  Accordingly, the Complaint fails all three criteria relevant to

whether a contractual impairment is "substantial," and was properly dismissed on

that ground alone.

> **B.     The Complaint Does Not Plausibly Allege that the Executive Order Was Not an "Appropriate" and "Reasonable" Way to Advance a Significant and Legitimate Public Interest.**

The Contracts Clause "does not trump the police power of a state to protect

the general welfare of its citizens, a power which is 'paramount to any rights under

contracts between individuals.'"  *Buffalo Teachers Fed'n*, 464 F.3d at 367 (quoting

*Allied Structural Steel*, 438 U.S at 241).  Accordingly, even where substantive

contract rights are entirely "wiped out" by a legislative action, the Contracts Clause

is not necessarily violated.  *Sveen*, 138 S.Ct. at 1825-26.  Thus, even a substantial

impairment of contractual obligations does not violate the Contracts Clause where

---

[24]  There can be no deprivation of contract remedies where no breach has been
established in the first place.  Yet, MCOFU and Mosher have never alleged that
any adjudicator has found that the Commonwealth breached the CBA by issuing
and implementing the EO.

the State's action "is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Sveen*, 138 S.Ct. at 1822 (quoting *Energy Res. Grp.*, 459 U.S. at 411–412).  For the following reasons, MCOFU and Mosher have not plausibly alleged that the EO fails this second part of the *Sveen* test.

### 1.     The Standard of Review Is Comparable to the "Rational Basis" Test.

Notwithstanding that cases applying the Contracts Clause have used words such as "appropriate" and "reasonable" to describe impairments of contract that pass constitutional muster, the standard of review that applies in this case is comparable to the rational basis test for two reasons.  First, the "default" standard governing impairment of *private* contracts reduces to the same highly deferential standard applicable to state legislative actions under the substantive due process clause.  Second, there is no basis in *this* case for departing from that default standard, even though the Commonwealth is a party to the CBA.

### a.     Where Private Contracts Are Impaired By State Action, Courts Ask Only Whether the Action Is a Legitimate Exercise of the State's Police Powers.

In this context, the requirement of a "legitimate public purpose" has often been described as coextensive with an exercise of the "police power."  *Houlton Citizens' Coal.*, 175 F.3d at 191 ("'The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a

benefit to special interests.'") (quoting *Energy Res. Grp.*, 459 U.S. 400 at 413); *see also Local Div. 589*, 666 F.2d at 639 ("[Courts] have frequently held that contracts are impliedly limited by, and subject to, the implicit authority of the state to exercise its 'police power.'"); *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 737 (7th Cir. 1987) (upholding ordinance where it "represent[ed] a rational allocation of rights and responsibilities between landlords and tenants . . . [and] an allocation that the city rationally could have believed would lead to improved public health and welfare.").

At least since *Blaisdell*,[25] scholars and courts have construed the test of whether a state action substantially impairing private contractual obligations is

---

[25]  In *Blaisdell*, the Supreme Court (quoting from a case involving legislation affecting the flow of a creek where a pre-existing contract provided for clear passage) wrote:

> The Court sustained the statute upon the ground that the private interests were subservient to the public right.  The Court said: 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals.'

*Blaisdell*, 290 U.S. at 239 (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905) (internal citation removed).

legitimate and reasonable as being akin to the highly deferential question whether state legislation serves a "rational justification," as is required by substantive due process, *Flemming v. Nestor*, 363 U.S. 603, 611 (1960).  *See Melendez v. City of New York*, 16 F.4th 992, 1049, 1050 (2d Cir. 2021) (Carney, J. concurring in part) (collecting scholarship explaining "that the modern standard of review for Contracts Clause challenges when private contracts are at issue is so deferential as to bear a resemblance to rational basis review"); *Baptiste v. Kennealy*, 490 F. Supp.3d 353, 385 (D. Mass. 2020) (Contracts Clause claim involving private contracts "meritorious only if it is proven that there was not a rational basis for the legislation at issue"); *Zogenix, Inc. v. Baker*, 2015 WL 1206354, *6 (D. Mass. 2015) (standard of scrutiny under Contracts Clause analogous to rational basis review where "government is not a contracting party") (quoting Erwin Chemerinsky, Constitutional Law §8.3.3 (4th ed. 2011).

Measured against this deferential standard, the Executive Order cannot possibly be held to violate the Contracts Clause.  In Contracts Clause cases where the State's own obligations of contract have been impaired, however, a question arises as to whether a "less deferential" standard applies.  For the reasons stated in the next section no such "less deferential" standard applies in *this* case, where the State's interests in promulgating the EO concerned public health and were not economic in nature.

### b.     No "Less Deferential" Standard of Scrutiny Applies Here, Where the Commonwealth's Interests Were Not Economic.

Although a robust line of cases holds that a "less deferential" standard of scrutiny applies where a state has impaired its own obligations under a contract, *see Sullivan*, 959 F.3d at 66, those cases are readily distinguishable from the instant case because they almost uniformly involve state action intended to reduce or delay the government's own monetary liability.  For example, *Sullivan*, *supra*, involved a wage freeze impacting county employees.  *See* 959 F.3d at 57. Similarly, *University of Hawai'i Prof. Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999), involved a legislative "pay lag."  *See* 183 F.3d at 1099-1100.  And, *United Steel Paper and Forestry Mfg. Allied Ind. & Serv. Workers Int'l v. Government of Virgin Islands*, 842 F.3d 201 (3rd Cir. 2016) involved a wage reduction.  *See* 842 F.3d at 204-205.

A state's "debt contracts" are regularly held binding, because states cannot function in the public interest without "the power to enter into effective financial contracts."  *U.S. Trs.*, 431 U.S. at 24.  Thus, it follows that, where a state has impaired its own "financial obligation," the state's action does not "automatically to fall within the reserved powers that cannot be contracted away."  *Id.* at 23–25. This makes sense, since "[i]f a State could reduce its financial obligation whenever

it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 26.

But there is no indication *here* that Massachusetts is "acting like a private party who reneges to get out of a bad deal" rather than in the public interest. *See Sullivan*, 959 F.3d at 65-66. Instead, just as in the context of a state's impairment of private contractual obligations, "no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests," and thus, "a court properly may defer to the [State's] judgment." *Houlton*, 175 F.3d at 191.

This distinction between cases where state action is deserving of less deference and cases where maximum deference should apply was illustrated by the Supreme Court in *United States Trustees*. There, the Supreme Court considered state action impacting the value of government bonds issued to fund a Port Authority. *U.S. Trs.*, 431 U.S. at 3-4. Because the state's own financial obligations were involved, the legislative action at issue did not "automatically . . . fall within the reserved powers that cannot be contracted away." *Id.* at 24-25. The Court cautioned, however, that "[n]ot every security provision" benefitting bondholders is "necessarily financial." *Id.* at 24. "For example, a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to

bind the State never to close the facility for health or safety reasons." *Id.* at 25.

Here, the same distinguishing factor described in *United States Trustees* exists.[26]

The CBA "surely could not validly be construed," *id.*, to prevent the

Commonwealth from adopting health and safety measures within its public

workforce during a pandemic, even though those health and safety members

impacted MCOFU's members.  Simply put, by entering a CBA, the

Commonwealth did not "contract away" its right to regulate in the interests of

health and safety.

Accordingly, where, as here, the Commonwealth has acted purely for health

and safety reasons and without impact on its own financial interests, the "less

deferential" standard normally applicable where a state has impaired its own

contracts should give way to the "default" standard applicable where private

contracts are impaired.  Measured against that more deferential standard, the EO

easily was "a reasonable and appropriate way to advance the significant goal of

---

[26]  In *Sullivan*, the Second Circuit provided a similar example of the difference
between a purely economic interest embodied in a contract and larger public
purpose:  "A government contract that induces a sword company to produce
plowshares cannot be abrogated by an otherwise valid statute simply because the
government later discovers that a knife company can make cheaper plowshares.
On the other hand, a clause in that contract that says the state will forego war
cannot keep the government from declaring war when the national security
demands it."  *Sullivan*, 959 F.3d at 63-64.

stopping the spread of COVID-19 in the state prison system," as the District Court

correctly held in ruling on Plaintiffs' MPI.  App. at 272.

**2.    Even If Some "Less Deferential" Standard of Review Applies, the Complaint Did Not Plausibly Allege That the Executive Order Would Not Survive Such Review.**

But even if a "less deferential" level of review *should* be applied to the

Executive Order, the Plaintiffs have not alleged facts that plausibly suggest a

vaccination requirement governing COs would not satisfy that standard.  To be

sure, where "more exacting scrutiny" is required in Contracts Clause cases, "the

inquiry becomes 'whether a less drastic modification would be sufficient and

whether the legislation was reasonable in light of changed circumstances.'" *United

Steel Paper*, 842 F.3d at 212 (quoting *Keystone Bituminous Coal Ass'n v. Duncan*,

771 F.2d 707, 717 (3d Cir. 1985)).

But "[l]ess deference" does not imply "no deference." *Buffalo Teachers*,

464 F.3d at 370; *see also Baltimore Teachers,* 6 F.3d at 1019 (even where

"complete deference is inappropriate," at least "some deference to legislative

policy decisions to modify [labor] contracts in the public interest must be

accorded").  And the Contracts Clause does not "require the courts — even where

public contracts have been impaired — to sit as superlegislatures," second-

guessing a state's policy judgments. *Baltimore Teachers*, 6 F.3d at 1021.  Further,

even though Plaintiffs contend there are less drastic measures that could have been

employed to slow the spread of COVID-19 in the State's prison system, Pl.Br. at 39, courts are "ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives" and "have no objective standards against which to assess the merit of the multitude of alternatives." *Id.* at 1022.

Ultimately, "[a] court's task" in considering a Contracts Clause claim is "'to reconcile the strictures of the Contract Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'" *United Auto.,* 633 F.3d at 41 (quoting *Mercado–Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9, 14 (1st Cir.1997)). Thus, it is implausible, even under "less deferential" scrutiny, that the Commonwealth's reserved sovereign power to safeguard its citizens during a global pandemic could be held to have been outweighed by any obligation it may have had under the CBA. *See Wise v. Inslee*, 2:21-CV-0288, 2022 WL 1243662, *7 (E.D. Wash. April 27, 2022) (dismissing Contracts Clause claim where there was "no doubt" that COVID-19 vaccination requirement affecting unionized state employees was "an appropriate and reasonable way to advance a significant and legitimate public purpose"). Accordingly, the Order of Dismissal should be affirmed as to Count One, regardless of what standard of review applies under the Contracts Clause.

40

**IV.    The District Court Correctly Dismissed Counts Two and Three Because the Complaint States No Plausible Claim for a Violation of MCOFU Members' Substantive Due Process Rights.**

Notwithstanding that the constitutionality of many COVID-19 related vaccine requirements has been affirmed by numerous courts across the country, MCOFU and Mosher argue that the District Court erred by concluding that the Executive Order did not implicate any fundamental rights of MCOFU's members and, consistent with that conclusion, by applying the "rational basis" standard of review. Pl.Br. at 18-19. Because, however, Supreme Court case law establishes not only that the lowest level of constitutional scrutiny applies to governmental vaccination requirements, but also that such requirements pass that deferential standard of review, MCOFU and Mosher have failed to plausibly plead any violation of their substantive due process rights. Accordingly, the District Court's order dismissing Counts Two and Three should be affirmed.

**A.    Numerous Courts Have Upheld Governmental Vaccination Requirements, As Required By *Jacobson*.**

State and local vaccine mandates have long been held constitutional. In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court rejected a constitutional challenge to a mandatory smallpox vaccination broadly imposed by the City of Cambridge upon its citizens (enforced by *criminal* fines), holding that such a measure represented a valid exercise of the State's police powers and did not "invade[] any right secured by the Federal Constitution." *Id*. at 38. The

41

*Jacobson* Court made clear that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" and "it was the duty of the constituted authorities to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few." *Id*. at 27, 29. Further, in *Jacobson*, the Court explained that only a vaccination measure having "no real or substantial relation" to the "public health, the public morals, or the public safety," or that is "beyond all question, a plain, palpable invasion of the rights secured by the fundamental law" should be disturbed by the courts. *Id*. at 31.

In the years that followed, the Supreme Court approved state policies requiring vaccination as a condition of receiving a public benefit such as attending school. *See Zucht v. King*, 260 U.S. 174, 176 (1922); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). And, over the decades preceding the onset of the COVID-19 pandemic, federal courts rejected a series of constitutional challenges to public school vaccine mandates by applying *Jacobson*, *Zucht*, and *Prince*.[27]

---

[27] *See, e.g., Phillips v. City of New York*, 775 F.3d 538, 542-45 (2d Cir. 2015); *Workman v. Mingo Cnty. Bd. of Educ*, 419 F.App'x 348, 352-56 (4th Cir. 2011); *V.D. v. State of New York*, 403 F.Supp.3d 76, 86-88 (E.D.N.Y. 2019); *W.B. v. Crossroads Academy-Central Street*, No. 4:19-cv-00682, 2019 WL 6257963, *1 (W.D. Mo. 2019); *Whitlow v. California,* 203 F.Supp.3d 1079, 1083-85 (S.D. Cal. 2016).

Moreover numerous courts have recently upheld the constitutionality of a variety of COVID-19-related vaccine requirements.  In *Does 1-6 v. Mills*, 16 F.4th 20 (2021), this Court upheld a Maine regulation mandating that all workers in licensed healthcare facilities receive a COVID-19 vaccine.  Other Courts of Appeals have rejected constitutional challenges to COVID-19 vaccine mandates in the education context, *see Klaassen v. Trustees of Indiana Univ.* 7 F.4th 592 (7th Cir. 2021); *Doe v. San Diego Unified Sch. Dist.*, 19 F. 4th 1173, 1177-1180 (9th Cir. 2021), and in the health care context, *see We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 290 (2d Cir. 2021).  Many federal district court cases have reached similar conclusions in the COVID-19 context.[28]

All of these results are required by *Jacobson*, which remains good law, regardless of MCOFU and Mosher's arguments as to why that longstanding

---

[28] *See, e.g.*, *Harris v. Univ. of Mass., Lowell*, 557 F.Supp.3d 302, 312, 314 (D. Mass.); *Johnson v. Brown*, 567 F.Supp.3d 1230, 1251-54 (D. Or. 2021) (denying preliminary injunction motion in constitutional challenge to Oregon state employee vaccine requirement partially because it was unlikely to succeed on the merits of substantive due process claim); *Troogstad v. City of Chicago*, 571 F.Supp.3d 901, 910-913 (N.D. Ill. 2021) (same as to state and city employee vaccine requirement); *Norris v. Stanley*, 567 F.Supp.3d 818, 821-823 (W.D. Mich. 2021) (same as to state university vaccine requirement); *Messina v. College of New Jersey*, 566 F.Supp.3d 236, 245-49 (D.N.J. 2021) (same as to university student vaccine requirement); *Children's Health Def. v. Rutgers*, No. 21-15333, 2021 WL 4398743, *5-6 (D.N.J. 2021) (same as to university student vaccine requirement); *America's Frontline Drs. v. Wilcox*, No. 21-1243, 2021 WL 4546923, *4-5 (C.D. Cal. 2021) (same as to university vaccine requirement for personnel, students, and trainees); *Gold v. Sandoval*, No. 3:21-CV-00480, 2021 WL 5762190, *2-3 (D. Nev. 2021) (same as to university student vaccine requirement).

precedent should be deemed no longer controlling.  *See* Pl.Br. at 40-41.  As the

District Court accurately observed, recent decisions have confirmed the continuing

soundness of *Jacobson* and, thus, "declining a vaccine does not give rise to a

fundamental right[.]"  App. at 304.  Moreover, MCOFU and Mosher are incorrect

in asserting that none of the courts recently applying *Jacobson* has "considered the

vitality of that rule in the face of" the Supreme Court's decisions in *Washington v.*

*Glucksberg*, 521 U.S. 702, 720 (1997), and *Cruzan v. Director of Missouri*

*Department of Health*, 497 U.S. 261 (1990).  Pl.Br. at 41.

     To the contrary, many courts have recently acknowledged *Jacobson*'s

precedential value notwithstanding the evolution of the Supreme Court's

jurisprudence on substantive due process since that case was decided.  *See, e.g.*,

*We the Patriots*, 17 F.4th at 293 (discussing *Cruzan* and holding plaintiffs'

"contention that *Jacobson* . . . [has] been implicitly overruled by the Supreme

Court likewise finds no support in caselaw."); *Troogstad*, 571 F.Supp.3d at 909-

910 (rejecting plaintiffs' argument that *Jacobson* is not controlling because "the

Supreme Court has given no indication that *Jacobson* is void"); *Andre-Rodney v.*

*Hochul*, No. 21-cv-1053, 2022 WL 3027094, *7 (N.D.N.Y. Aug. 1, 2022) (no

authority suggesting that the protected liberty interest at issue in *Cruzan* "is a

fundamental right or that it is broad enough to cover the right to refuse vaccination

in these circumstances"); *Brox v. Woods Hole*, 509 F.Supp.3d 359, 368-369 (D.

Mass. 2022) (plaintiffs "misinterpreted the Supreme Court's recognition [in *Cruzan*] of a '*general* liberty interest in refusing medical treatment' as a *fundamental* liberty interest[,]" but "[t]he difference [between them] is significant.") (emphasis in original).  In short, the Plaintiffs have failed to distinguish *Jacobson* from the case now before the Court.[29]  The District Court's dismissal of Counts Two and Three should be affirmed for this reason alone.

**B.      The District Court Properly Applied the Substantive Due Process Framework in Dismissing MCOFU's Claim**

Notwithstanding that *Jacobson* provides a direct route to affirmance of the District Court's dismissal of Counts Two and Three, separate consideration of each stage of the traditional substantive due process analysis leads to the same destination.

---

[29] To the extent *Jacobson* is distinguishable from the instant matter, the sole distinguishing factor is that the *Jacobson* Court upheld a vaccination requirement that was far more restrictive of personal choice than was the EO.  *Jacobson* involved a "mandate" in the truest sense (where the ordinance required all persons to be vaccinated against smallpox, except children with documented medical exemptions).  Here, the EO did not force any person to obtain vaccination.  Rather, it presented MCOFU's members with the option to refuse vaccination and seek other employment.  *See We the Patriots*, 17 F.4th at 293-294 (plaintiffs-employees "do have a choice" as "[v]accination is a condition of employment in the healthcare field; the State is not forcibly vaccinating healthcare workers"); *Klaassen*, 7 F.4th at 593 (distinguishing state vaccine requirement conditioning attending state university with the vaccine mandate for "every adult member of the public" in *Jacobson*); *Wise*, 2022 WL 1243662 at *5 (Complaint dismissed where vaccine requirement provided plaintiffs with choice of becoming vaccinated or declining vaccination and seeking alternative employment).

### 1.    The Complaint Identifies No "Fundamental Right."

First, it is axiomatic that where state action "d[oes] not burden a

fundamental right . . . [it] need only be rationally related to a legitimate purpose in

order to pass Constitutional scrutiny." *LCM Enterprises, Inc. v. Dartmouth*, 14

F.3d 675, 678 (1st Cir. 1994); *see also Medeiros v. Vincent*, 431 F.3d 25, 32 (1st

Cir. 2005), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211

(2011) (where no fundamental right is implicated, substantive due process is

"governed by the 'rational basis' standard of review."). Recognizing this, MCOFU

and Mosher argue that the Supreme Court has recognized a generalized "right to

decline medical treatment" through its *Cruzan* and *Glucksberg* opinions. Pl.Br. at

29. Their argument, however, exaggerates the extent to which those opinions

stretched the Court's preexisting concept of fundamental rights.

### a.    The Supreme Court Has Not Recognized Any Broad "Fundamental Right" to Refuse Medical Treatment.

Contrary to the Plaintiffs' assertions, while the Supreme Court has indicated

there may be a constitutionally significant interest in refusing medical treatment, it

has not recognized any broad "fundamental right" arising therefrom. As explained

in *Glucksberg*: "[W]e have a tradition of carefully formulating the interest at stake

in substantive due process cases. For example, although *Cruzan* is often described

as a 'right to die' case . . . we were, in fact, more precise: We assumed that the

Constitution granted competent persons 'a constitutionally protected right to refuse

lifesaving hydration and nutrition.'" *Glucksberg*, 521 U.S. at 722-723; *see also Raich v. Gonzales*, 500 F.3d 850, 864 n.12 (9th Cir. 2007) ("In [*Cruzan*], the Court declined to frame the right as an unqualified right to die, and instead specifically construed the right as a 'constitutionally protected right to refuse lifesaving hydration and nutrition'") (quoting *Cruzan*, 497 U.S. at 279).  Thus, MCOFU and Mosher's broad claim that MCOFU's members possess a broad and fundamental "right to decline unwanted medical treatment" under the Fourteenth Amendment, Pl.Br. at 41, is directly foreclosed by the Supreme Court's own framework as laid out in *Glucksberg*.

Moreover, the *Glucksberg* opinion's "careful description" requirement, *see Glucksberg*, 521 U.S. at 703, is particularly important in the context of a *vaccine*, which is a medical treatment that is unique insofar as it protects both the recipient *and* others with whom the recipient may interact (including those who cannot, themselves, safely be vaccinated).  As the Court explained in *Jacobson*, in connection with the utility of vaccines as a public health measure:

> If the mode adopted by the [C]ommonwealth of Massachusetts for the protection of its local communities against smallpox proved to be distressing, inconvenient, or objectionable to some . . . the answer is that it was the duty of the constituted authorities primarily to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few.

47

*Jacobson*, 197 U.S. at 28-29; *see also Troogstad*, 571 F.Supp.3d at 910 (distinguishing "rights to individual bodily autonomy that do not impact the public health" from the vaccine context, in which "an individual's behavior directly affects the health and welfare of others in the community" (alterations omitted)); *Kheriaty v. Regents of Univ. of Cal.*, No. 21-01367, 2021 WL 4714664, *5 (C.D. Ca. Sept. 29, 2021) (contrasting the right to refuse "lifesaving hydration and nutrition" recognized in *Glucksberg* with "an employer mandate to take a vaccine" having the purpose of "protecting the broader community at large").

For all of these reasons, the District Court's legal conclusion that "declining a vaccine does not give rise to a fundamental right," App. at 304, was perfectly sound. Because MCOFU and Mosher have failed to plausibly allege that the EO violates any fundamental right to refuse compliance with a governmental vaccine requirement the Court's Order of Dismissal should be affirmed.

### b.    Property Rights Are Not "Fundamental."

Additionally, there is no merit to MCOFU and Mosher's claim that the District Court should have applied strict scrutiny based on Mosher's "constitutionally-protected property interest in retaining his employment." Pl.Br. at 42. Even if MCOFU's members may have a property interest in continued employment, it is well established that such a property interest does not constitute a fundamental right to which strict scrutiny applies. *DeKalb Stone, Inc. v. County*

*of DeKalb*, 106 F.3d 956, 959 n.6 (11th Cir. 1997) ("[P]roperty rights have been

important common law rights throughout history and [. . . ] they are protected in

many situations by procedural due process.  Nevertheless, common law rights are

not equivalent to fundamental rights, which are created only by the Constitution

itself."); *see also Maniscalco v. New York City Dep't of Educ.*, 563 F.Supp.3d 33,

39 (E.D.N.Y. 2021), *aff'd*, No. 21-2343, 2021 WL 4814767 (2d Cir. Oct. 15,

2021), *cert. denied*, 142 S.Ct. 1668 (2022) ("[A]ny property right to employment

that plaintiffs may claim does not rise to the level of a fundamental right protected

by substantive due process.").  MCOFU and Mosher's opening brief presents no

substantive argument to the contrary, *see* Pl.Br. at 42, and thus, any such

arguments are waived.  *See Sparkle Hill, Inc. v. Interstate Mat. Corp.*, 788 F.3d 25,

29 (1st Cir. 2015) (arguments for reversing district court decision will not be

considered if not raised in appellant's opening brief).  But in any event, the District

Court committed no error in applying rational basis review to the Plaintiffs'

substantive due process claims.[30]

---

[30]  MCOFU and Mosher make passing reference to "the doctrine of unconstitutional conditions" and argue briefly that the Complaint adequately alleged a claim that the Executive Order posed "an unconstitutional choice."  Pl.Br. at 42.  Even assuming this reference to the unconstitutional conditions doctrine "rise[s] to the level of appellate argument," *see Cutler v. Dep't. of Health & Human Servs.*, 23 F.Appx. 12, *1 (1st Cir. 2001), it is unhelpful to MCOFU and Mosher because the Complaint did not plausibly allege an actionable claim under that doctrine.  To state an unconstitutional conditions claim, plaintiffs must identify

(footnote continued)

## 2.    Plaintiffs Allege No Plausible Claim that the Executive Order Is Unsupported by a Rational Basis.

MCOFU does not contest that, if rational basis review applies, the Executive Order readily surpassed that bar.  Instead, MCOFU and Mosher "acknowledge that the plausibility" of their substantive due process claims "turns" on whether their asserted right is subject to rational basis review or strict scrutiny review. Pl.Br. at 40.  Thus, they have waived any argument to the contrary.  *See Sparkle Hill*, 788

----

a constitutionally enumerated right that the state could have coerced them to relinquish.  *See Norris*, 567 F.Supp.3d at 822; *Legaretta v. Macias*, 21-cv-179, 2022 WL 1443014, *12 (D.N.M. May 6, 2022).  Because the Complaint fails to allege that the EO violates any such right, it cannot plausibly allege that the vaccine mandate constitutes an unconstitutional condition.  Numerous courts have rejected unconstitutional conditions arguments in the context of COVID-19 vaccine mandates for this very reason.  *See Norris*, 567 F.Supp.3d at 822 (plaintiff's unconstitutional conditions argument "cannot succeed" where the "vaccine mandate does not violate any of Plaintiff's fundamental rights"); *Andre-Rodney*, 2022 WL 3027094, *7-8 (plaintiffs failed to allege their employment was conditioned on their "'giving up" a right protected by substantive due process, since the State could directly impose a vaccination requirement pursuant to its police power); *Legaretta*, 2022 WL 1443014, *12 (because vaccine requirement did not violate fundamental rights, unconstitutional condition challenge "necessarily fails"); *Smith v. Biden*, No. 1:21-CV-19457, 2021 WL 5195688, *8 (D.N.J. Nov. 8, 2021), *appeal docketed*, No. 21-3091 (3d. Cir. Nov. 20, 2021) ("Plaintiffs are undeniably being presented with a difficult choice — comply with the vaccine mandate or risk losing their employment.  They are, however, presented with a choice and . . . are not being coerced to give up a fundamental right since there is no fundamental right to refuse vaccination."); *Doe #1-#14 v. Austin*, 572 F.Supp.3d 1224, 1240-1241 (N.D. Fla. 2021) ("Even if continued employment in the military were a conditional benefit for the purposes of the doctrine, the plaintiffs would still fail because a condition cannot be unconstitutional if it could be constitutionally imposed directly[.]" (internal quotation marks and citation omitted)).

F.3d at 29.  In any event, the District Court correctly concluded that "EO 595 is rationally related to the legitimate government interest in stemming the spread of COVID-19," that "vaccines are a safe and effective way to prevent the spread of COVID-19[,]" and stemming the spread of COVID-19 is "unquestionably a compelling interest."  App. at 305 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020)).  For all of these reasons, this Court should affirm the District Court's order dismissing Counts Two and Three of the Plaintiffs' Complaint.

## V.     Plaintiffs Have Waived Their Appeal from Dismissal of Count Four, Which Was Required By the Eleventh Amendment.

To the extent MCOFU and Mosher intended to appeal from the District Court's dismissal of Count Four of their Complaint, they have waived that appeal by declining to present any argument on it in their appellate brief.  *See Sparkle Hill*, 788 F.3d at 29.  In any event, there is no question that Count Four was properly dismissed as barred by the Eleventh Amendment.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials how to conform their conduct to state law"); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 43 (1st Cir. 2006) ("While *Ex Parte Young*, 209 U.S. 123 (1908) permits injunctive relief based on federal constitutional claims, it does not allow injunctive relief against state officials for violation of *state law*. . . .") (emphasis in

51

original); *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998)

("[i]t is not the proper purview of a federal court to supervise state officials'

compliance with state law").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court of Appeals should affirm the

District Court's Order of Dismissal as to all four counts of the Complaint.

Respectfully submitted,

ANDREA JOY CAMPBELL,
  *Attorney General of Massachusetts*

/s/ *Jennifer E. Greaney*
Jennifer E. Greaney, 1st Cir. No. 1156842
Christine Fimognari, 1st Cir. No. 1198115
Grace Gohlke, 1st Cir. No. 1204282
  *Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2981
jennifer.greaney@mass.gov
christine.fimognari@mass.gov
grace.gohlke@mass.gov

January 16, 2023

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32</u>

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,702 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(f).

2.      This Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

*/s/ Jennifer E. Greaney*
Jennifer E. Greaney, 1st Cir. No. 1156842
*Assistant Attorney General*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on February 16, 2023.

/s/ Jennifer E. Greaney
Jennifer E. Greaney, 1st Cir. No. 1156842
*Assistant Attorney General*

# **ADDENDUM**

## **Federal Statutes**

28 U.S.C. §1367 ..................................................................................ADD.002

42 U.S.C. §1983 ..................................................................................ADD.004


## **State Statutes**

Mass. Gen. L. c. 27, § 2 ......................................................................ADD.005

Mass. Gen. L. c. 150E, § 1 ..................................................................ADD.006

Mass. Gen. L. c. 150E, § 2 ..................................................................ADD.009

Mass. Gen. L. c. 150E, § 4 ..................................................................ADD.010

Mass. Gen. L. c. 150E, § 6 ..................................................................ADD.012

Mass. Gen. L. c. 150E, § 10 ................................................................ADD.013

Mass. Gen. L. c. 150E, § 11 ................................................................ADD.015


## **Rules and Regulations**

Fed. R. Civ. P. 12(b) ...........................................................................ADD.017

456 Code Mass. Reg. § 15.05 ..............................................................ADD.019

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by   In re Mid-Continent Electric, Inc.,   Bkrtcy.M.D.Fla.,   Apr. 11, 2002

---

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

---

28 U.S.C.A. § 1367

§ 1367. Supplemental jurisdiction

Currentness

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

  **(1)** the claim raises a novel or complex issue of State law,

  **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

  **(3)** the district court has dismissed all claims over which it has original jurisdiction, or

  **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)** The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

---

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

## CREDIT(S)

(Added Pub.L. 101-650, Title III, § 310(a), Dec. 1, 1990, 104 Stat. 5113.)

Notes of Decisions (1732)

28 U.S.C.A. § 1367, 28 USCA § 1367
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 21. Civil Rights (Refs & Annos)
Subchapter I. Generally

42 U.S.C.A. § 1983

§ 1983. Civil action for deprivation of rights [Statutory Text & Notes of Decisions subdivisions I to IX]

Effective: October 19, 1996

Currentness

<Notes of Decisions for 42 USCA § 1983 are displayed in multiple documents.>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**CREDIT(S)**

(R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104-317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

Notes of Decisions (6421)

42 U.S.C.A. § 1983, 42 USCA § 1983
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.    ADD.004    1

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title II. Executive and Administrative Officers of the Commonwealth (Ch. 6-28a)
Chapter 27. Department of Correction (Refs & Annos)

M.G.L.A. 27 § 2

§ 2. Deputy commissioners; salary; qualifications; employees

Currentness

The commissioner shall, with the approval of the secretary of public safety, appoint and may, with like approval, remove a deputy commissioner for institutional services, a deputy commissioner for personnel and training, and a deputy commissioner for community services. The position of deputy commissioner shall be classified in accordance with section forty-five of chapter thirty and the salary shall be determined in accordance with section forty-six C of said chapter thirty and he shall devote his full time during business hours to the duties of his office. All such deputy commissioners shall possess qualifications of character and ability similar to that required of the commissioner, and shall have had training and experience in work generally similar to those required of the commissioner or otherwise suitably preparing them for the work of their respective offices. They shall not be subject to the provisions of section nine A and nine B of chapter thirty, or chapter thirty-one. The commissioner may designate any deputy commissioner to discharge the duties of the commissioner during his absence or disability.

Subject to appropriation and to all applicable requirements of chapter thirty or thirty-one, the commissioner shall appoint and may remove such other officers and such employees as the work of the department shall require, provided, that said commissioner may require that a physician who is to be so appointed be certified as to his qualifications by one of the physicians' specialty boards approved by the Council on Medical Education and Hospitals of the American Medical Association; and from time to time he may, subject to appropriations, employ such consultants as he deems necessary. Subsequent to January first, nineteen hundred and eighty-eight, no person who smokes any tobacco product shall be eligible for appointment as an employee of the department in a position or office the regular or incidental duties of which require the care, supervision, or custody of prisoners, criminally insane persons or defective delinquents and no person so appointed after said date shall continue in such office or position if such person thereafter smokes any tobacco product; the personnel administrator shall promulgate regulations for the implementation of the provisions of this sentence.

**Credits**

Added by St.1955, c. 770, § 1. Amended by St.1956, c. 16, § 1; St.1957, c. 482, § 3; St.1963, c. 801, § 67; St.1969, c. 766, § 41; St.1971, c. 116, § 39; St.1971, c. 1102, § 1; St.1972, c. 300, § 37; St.1972, c. 777, § 1; St.1973, c. 426, § 40; St.1974, c. 422, § 45; St.1977, c. 234, §§ 118 to 120; St.1977, c. 872, §§ 115 to 117; St. 1981, c. 699, § 52; St.1985, c. 737, § 28; St.1987, c. 697, § 6; St.1991, c. 138, § 255.

Notes of Decisions (3)

M.G.L.A. 27 § 2, MA ST 27 § 2
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

End of Document     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 1

§ 1. Definitions

Effective: November 4, 2012

Currentness

The following words and phrases as used in this chapter shall have the following meaning unless the context clearly requires otherwise:--

"Board", the board of conciliation and arbitration established under section seven of chapter twenty-three.

"Commission", the labor relations commission established under section nine *O* of chapter twenty-three.

"Cost items", the provisions of a collective bargaining agreement which require an appropriation by a legislative body.

"Employee" or "public employee", any person in the executive or judicial branch of a government unit employed by a public employer except elected officials, appointed officials, members of any board or commission, representatives of any public employer, including the heads, directors and executive and administrative officers of departments and agencies of any public employer, and other managerial employees or confidential employees, and members of the militia or national guard and employees of the commission, and officers and employees within the departments of the state secretary, state treasurer, state auditor and attorney general. Employees shall be designated as managerial employees only if they (a) participate to a substantial degree in formulating or determining policy, or (b) assist to a substantial degree in the preparation for or the conduct of collective bargaining on behalf of a public employer, or (c) have a substantial responsibility involving the exercise of independent judgment of an appellate responsibility not initially in effect in the administration of a collective bargaining agreement or in personnel administration. Employees shall be designated as confidential employees only if they directly assist and act in a confidential capacity to a person or persons otherwise excluded from coverage under this chapter. In the case of employees of the alcoholic beverage control commission, "employer" shall mean the state treasurer or his designee.

"Employee organization", any lawful association, organization, federation, council, or labor union, the membership of which includes public employees, and assists its members to improve their wages, hours, and conditions of employment.

"Employer" or "public employer", the commonwealth acting through the commissioner of administration, or any county, city, town, district, or other political subdivision acting through its chief executive officer, and any individual who is designated to represent one of these employers and act in its interest in dealing with public employees, but excluding authorities created pursuant to chapter one hundred and sixty-one A and those authorities included under the provisions of chapter seven hundred and sixty of the acts of nineteen hundred and sixty-two. In the case of school employees, the municipal employer shall be represented by the school committee or its designated representative or representatives. For this purpose, the chief executive officer of a city or town or his designee shall participate and vote as a member of the city or town school committee; provided, however, that if there is no town manager or town administrator in a town, the chairman of the board of selectmen or his designee shall so participate and vote. In the case of a regional school district, said chief executive officers or chairmen of boards of selectmen, as the case may be, of the member cities and towns shall, in accordance with regulations to be promulgated by the

board of education, elect one of their number to represent them pursuant to the requirements of this section. In the case of employees of the system of public institutions of higher education, the employer shall mean the board of higher education or any individual who is designated to represent it and act in its interest in dealing with employees, except that the employer of employees of the University of Massachusetts shall be the board of trustees of the university or any individual who is designated to represent it and act in its interest in dealing with employees. In the case of judicial employees, the employer shall be the court administrator of the trial court or any individual who is designated by him to represent him or act in his interest in dealing with judicial employees. In the case of employees of the state lottery commission, employer shall mean the state lottery commission or its designee. In the case of employees of the Massachusetts Water Resources Authority, the employer shall mean the Massachusetts Water Resources Authority. In the case of employees of the Suffolk county sheriff's department, employer shall mean the sheriff of Suffolk county or any individual who is designated by him to represent him or act in his interest in dealing with such employees. In the case of personal care attendants as defined in section 70 of chapter 118E, the employer shall mean the PCA quality home care workforce council or its designee as defined in section 71 of chapter 118E. In the case of employees of the Massachusetts Department of Transportation, "employer" shall mean the Massachusetts Department of Transportation or any individual designated by the board of that department to represent it or act in its interest in dealing with employees.

"Incremental cost items", the provisions of a collective bargaining agreement that require, in respect of any fiscal year, an appropriation by a legislative body that is greater than the appropriation so required in the preceding fiscal year; provided, however, that in respect of the first fiscal year or portion thereof during which an agreement has effect, "incremental cost items" shall mean the provisions of a collective agreement that require an appropriation by a legislative body of monies that are newly required by the employer to discharge the obligations arising under the terms of such agreement.

"Legislative body", the general court in the case of the commonwealth or a county, the city council or town meeting in the case of a city, town or district, or any body which has the power of appropriation with respect to an employer as defined in this chapter.

"Professional employee", any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, (ii) involving the consistent exercise of discretion and judgment in its performance, (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual or physical processes. Professional employee shall include a detective, member of a detective bureau or police officer who is primarily engaged in investigative work in any city or town police department which employs more than four hundred people.

"Strike", a public employee's refusal, in concerted action with others, to report for duty, or his wilful absence from his position, or his stoppage of work, or his abstinence in whole or in part from the performance of the duties of employment as established by an existing collective bargaining agreement or in a collective bargaining agreement expiring immediately preceding the alleged strike, or in the absence of any such agreement, by written personnel policies in effect at least one year prior to the alleged strike; provided that nothing herein shall limit or impair the right of any public employee to express or communicate a complaint or opinion on any matter related to conditions of employment.

"Written majority authorization", writings signed and dated by employees in the form of authorization cards, petitions, or such other written evidence that the commission finds suitable, in which a majority of employees in an appropriate bargaining unit designates an employee organization as its representative for the purpose of collective bargaining and certifies the designation to be its free act and deed and given without consideration. Employee signatures shall be dated within the 12 months preceding the date on which the writings are proffered to establish majority and exclusive representative status within the meaning of section 4.

**Credits**

Added by St.1973, c. 1078, § 2. Amended by St.1974, c. 354; St.1975, c. 689, § 11; St.1976, c. 480, § 20; St.1977, c. 278, §§ 1, 2; St.1977, c. 937, § 1; St.1978, c. 478, § 74; St.1980, c. 329, § 124; St.1981, c. 484; St.1981, c. 679, § 1; St.1984, c. 372, § 56; St.1991, c. 142, § 25; St.1992, c. 286, §§ 216, 274; St.1993, c. 71, § 62; St.1993, c. 495, § 36; St.1995, c. 39, § 10; St.1997, c. 66, § 22; St.2003, c. 140, § 35, eff. July 1, 2003; St.2007, c. 42, § 7, eff. May 16, 2007; St.2007, c. 120, § 3, eff. Dec. 26, 2007; St.2009, c. 25, § 99, eff. July 1, 2009; St.2011, c. 93, § 23, eff. July 1, 2012; St.2012, c. 224, §§ 143, 144, eff. Nov. 4, 2012.

Notes of Decisions (35)

M.G.L.A. 150E § 1, MA ST 150E § 1
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD.008

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XXI. Labor and Industries (Ch. 149-154)
            Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 2

§ 2. Collective bargaining; self organization

Currentness

Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, and other terms and conditions of employment, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion. An employee shall have the right to refrain from any or all of such activities, except to the extent of making such payment of service fees to an exclusive representative as provided in section twelve.

**Credits**
Added by St.1973, c. 1078, § 2.

Notes of Decisions (15)

M.G.L.A. 150E § 2, MA ST 150E § 2
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 4

§ 4. Exclusive representative; hearing; election; stipulation; certification;
review; verification of evidence of written majority authorization

Effective: December 26, 2007

Currentness

Public employers may recognize an employee organization designated by the majority of the employees in an appropriate bargaining unit as the exclusive representative of all the employees in such unit for the purpose of collective bargaining. All notices relative to a representation petition and all elections shall be posted at the request of the commission ten days prior to a hearing in a conspicuous place where the affected employees are employed.

The commission, upon receipt of an employer's petition alleging that one or more employee organizations claims to represent a substantial number of the employees in a bargaining unit, or upon receipt of an employee organization's petition that a substantial number of the employees in a bargaining unit wish to be represented by the petitioner, or upon receipt of a petition filed by or on behalf of a substantial number of the employees in a unit alleging that the exclusive representative therefor no longer represents a majority of the employees therein, shall investigate, and if it has reasonable cause to believe that a substantial question of representation exists, shall provide for an appropriate hearing upon due notice. If, after hearing, the commission finds that there is a controversy concerning the representation of employees, it shall direct an election by secret ballot or shall use any other suitable method to determine whether, or by which employee organization the employees in an appropriate unit desire to be represented, and shall certify any employee organization which received a majority of the votes in such election as the exclusive representative of such employees.

Except for good cause no election shall be directed by the commission in an appropriate bargaining unit within which a valid election has been held in the preceding twelve months, or a valid collective bargaining agreement is in effect. The commission shall by its rules provide an appropriate period prior to the expiration of such agreements when certification or decertification petitions may be filed.

Nothing in this section shall be construed to prohibit a stipulation, in accordance with regulations of the commission, by an employer and an employee organization for the waiving of hearing and the conducting of a consent election by the commission for the purpose of determining a controversy concerning the representation of employees.

Any hearing under this section may be, when so determined by the commission, conducted by a member or agent of the commission. The decisions and determinations of such member or agent shall be final and binding unless, within ten days after notice thereof, any party requests a review by the full commission. If a review is requested, the member or agent shall file with the commission and with the parties a written statement of the case. In addition any party may, within ten days from the receipt of such statement, file a supplementary statement with the commission. A review by the commission shall be made upon such statement of the case by the member or agent and upon such supplementary statements filed by the parties, if any, together with such other evidence as the commission may require.

Notwithstanding any other provision of this section, the commission shall certify and the public employer shall recognize as the exclusive representative for the purpose of collective bargaining of all the employees in the bargaining unit an employee organization which has received a written majority authorization, but this shall apply only when no other employee organization has been and currently is lawfully recognized as the exclusive representative of the employees in the appropriate bargaining unit. Whenever an employee organization proffers evidence that it has received a written majority authorization, the employee organization and the public employer shall agree upon a neutral to conduct a confidential inspection of the evidence of a written majority authorization. If within 10 days the employee organization and the public employer do not agree upon a neutral, the commission shall act as the neutral. The neutral shall verify the employee organization's majority support within the appropriate bargaining unit and report the results of its inspection in writing to the parties and, if the verification was conducted by an agreed neutral, to the commission, which shall in turn certify the results to the parties in writing. The commission shall establish rules and procedures for the prompt verification of evidence of a written majority authorization, which rules shall include safeguards to protect the privacy of individual employee choice, and which shall further provide that, absent exceptional cause, the verification procedure shall not last longer than 30 days after the appointment of the neutral or after the assumption by the commission of the duties of the neutral.

**Credits**

Added by St.1973, c. 1078, § 2. Amended by St.1978, c. 562; St.2007, c. 120, § 4, eff. Dec. 26, 2007.

Notes of Decisions (14)

M.G.L.A. 150E § 4, MA ST 150E § 4
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 6

§ 6. Negotiations; meetings

Currentness

The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budget-making process and shall negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment, including without limitation, in the case of teaching personnel employed by a school committee, class size and workload, but such obligation shall not compel either party to agree to a proposal or make a concession; provided, however, that in no event shall the right of any employee to run as a candidate for or to hold elective office be deemed to be within the scope of negotiation.

**Credits**

Added by St.1973, c. 1078, § 2. Amended by St.1986, c. 412; St.1989, c. 470.

Notes of Decisions (116)

M.G.L.A. 150E § 6, MA ST 150E § 6
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 10

§ 10. Prohibited practices

Currentness

(a) It shall be a prohibited practice for a public employer or its designated representative to:

(1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter;

(2) Dominate, interfere, or assist in the formation, existence, or administration of any employee organization;

(3) Discriminate in regard to hiring, tenure, or any term or condition of employment to encourage or discourage membership in any employee organization;

(4) Discharge or otherwise discriminate against an employee because he has signed or filed an affidavit, petition, or complaint or given any information or testimony under this chapter, or because he has informed, joined, or chosen to be represented by an employee organization;

(5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six;

(6) Refuse to participate in good faith in the mediation, fact-finding, and arbitration procedures set forth in sections eight and nine;

(b) It shall be a prohibited practice for an employee organization or its designated agent to:

(1) Interfere, restrain, or coerce any employer or employee in the exercise of any right guaranteed under this chapter;

(2) Refuse to bargain collectively in good faith with the public employer, if it is an exclusive representative, as required in section six;

(3) Refuse to participate in good faith in the mediation, fact finding and arbitration procedures set forth in sections eight and nine.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

**Credits**

Added by St.1973, c. 1078, § 2. Amended by St.1974, c. 589, § 2.

Notes of Decisions (130)

M.G.L.A. 150E § 10, MA ST 150E § 10
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 150E. Labor Relations: Public Employees (Refs & Annos)

M.G.L.A. 150E § 11

§ 11. Complaints; investigation; hearing; orders; review; hearings before board

Effective: March 27, 2011

Currentness

(a) When a complaint is made to the department of labor relations that a practice prohibited by section 10 has been committed, the director may refer the matter to an investigator. The employer, the employee organization, or the person so complained of shall have the right to file an answer to the original or amended complaint within 5 days after the service of such complaint or within such other time as the department may require. Before the receipt of any answer, any complaint may be amended as of right, and, after the receipt of any answer, only with the permission of the department.

(b) The investigator may issue an order dismissing the complaint, deferring any complaint which is the subject of a pending grievance or arbitration, referring any complaint to one of the department's mediators, or directing that a hearing take place. Unless the complaint is dismissed, deferred, or referred, the investigator shall promptly meet with the parties, investigate whether settlement of the complaint is possible, clarify and narrow the issues before the complaint is forwarded to a hearing, or dismiss the complaint without a hearing. The investigator may dismiss the complaint if she finds no probable cause to believe that a violation of this chapter has occurred or if she otherwise determines that further proceedings would not effectuate the purposes of this chapter.

(c) If a hearing is ordered, the department shall set the time and place for the hearing, which time and place may be changed by the department at the request of one of the parties for cause shown. Any party may file a motion to dismiss the complaint or for a summary decision prior to a hearing. At the hearing, which shall be presided over by a hearing officer, the employer, the employee organization, or the person so complained of shall have the right to appear in person or otherwise to defend against the complaint. At the discretion of the department, any person may be allowed to intervene in such proceeding. In any hearing, the department shall not be bound by the technical rules of evidence prevailing in the courts. The testimony, if any, may be preserved by a taped recording or, at the discretion of the parties who shall be responsible for the costs thereof, by stenographic transcription.

(d) At the conclusion of the hearing, the hearing officer shall issue written findings of fact and shall determine whether a practice prohibited under section 10 has been committed and, if so, shall issue an order requiring the charged party to cease and desist from such prohibited practice, and shall take such further affirmative action as will comply with the provisions of this section, including but not limited to the withdrawal of certification of an employee organization established by or assisted in its establishment by any such prohibited practice. The hearing officer shall order the reinstatement with or without back pay of an employee discharged or discriminated against in violation of the first paragraph of this chapter. If the hearing officer determines that a practice prohibited under section 10 has not been or is not being committed, the hearing officer shall state her findings of fact and issue an order dismissing the complaint.

(e) Any order issued pursuant to this section shall become final and binding unless, within 10 days after notice thereof, any party requests a review by the board. A review may be made upon the record, which shall consist of the pleadings, motions, rulings, and the testimony taken at the hearing, if any, or upon such portions of the record as the parties may designate.

(f) Upon any complaint made under this section and a petition filed by one or more parties to the proceeding, the board, in its discretion, and for good cause shown, may order that the hearing be conducted by the board itself. At such hearing the employer, the employee organization or the person so complained of shall have the right to appear in person or otherwise to defend against such complaint. At the discretion of the board, any person may be allowed to intervene in such proceeding. In any hearing, the board shall not be bound by the technical rules of evidence prevailing in the courts. The testimony, if any, may be preserved by a taped recording or, at the discretion of the parties who shall be responsible for the costs thereof, by stenographic transcription.

(g) At the conclusion of the hearing, the board shall state its findings of fact and shall determine whether a practice prohibited under section 10 has been committed and if so, it shall issue an order requiring the charged party to cease and desist from such prohibited practice, and shall take such further affirmative action as will comply with the provisions of this section, including but not limited to the withdrawal of certification of an employee organization established by or assisted in its establishment by any such prohibited practice. The board shall order the reinstatement with or without back pay of an employee discharged or discriminated against in violation of the first paragraph of this chapter. If the board determines that a practice prohibited under section 10 has not been or is not being committed, it shall state its findings of fact and issue an order dismissing the complaint.

(h) Whenever it is alleged that a party has refused to bargain collectively in good faith with the exclusive representative as required in section 10 and that such refusal is based upon a dispute involving the appropriateness of a bargaining unit, the department shall, except for good cause shown, issue an interim order requiring the parties to bargain pending its determination of the dispute. Where such interim order is issued, the board shall hold a hearing on the charge in a summary manner and shall speedily determine the issues raised and shall make an appropriate decision.

(i) The board may institute appropriate proceedings in the appeals court for enforcement of its final orders. Any party aggrieved by a final order of the board may institute proceedings for judicial review in the appeals court within 30 days after receipt of the order. The proceedings in the appeals court shall, insofar as applicable, be governed by section 14 of chapter 30A. The commencement of such proceedings shall not, unless specifically ordered by the court, operate as a stay of the board's order.

**Credits**

Added by St.1973, c. 1078, § 2. Amended by St.1974, c. 589, § 3; St.1977, c. 788; St.1981, c. 351, §§ 243 to 245; St.1987, c. 412; St.2007, c. 145, § 7, eff. Nov. 12, 2007; St.2011, c. 3, §§ 141 to 143, eff. Mar. 27, 2011.

Notes of Decisions (150)

M.G.L.A. 150E § 11, MA ST 150E § 11
Current through the 2022 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD.016

---

United States Code Annotated
    Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
        Title III. Pleadings and Motions

Federal Rules of Civil Procedure Rule 12

Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings;
Consolidating Motions; Waiving Defenses; Pretrial Hearing [Rule Text & Notes of Decisions subdivisions I, II]

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 12 are displayed in multiple documents. >

**(a) Time to Serve a Responsive Pleading.**

**(1) *In General.*** Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

**(A)** A defendant must serve an answer:

**(i)** within 21 days after being served with the summons and complaint; or

**(ii)** if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent, or within 90 days after it was sent to the defendant outside any judicial district of the United States.

**(B)** A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

**(C)** A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

**(2) *United States and Its Agencies, Officers, or Employees Sued in an Official Capacity.*** The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

**(3) *United States Officers or Employees Sued in an Individual Capacity.*** A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

---

**(4)** *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

**(A)** if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

**(B)** if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

**(b) How to Present Defenses.** Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

**(1)** lack of subject-matter jurisdiction;

**(2)** lack of personal jurisdiction;

**(3)** improper venue;

**(4)** insufficient process;

**(5)** insufficient service of process;

**(6)** failure to state a claim upon which relief can be granted; and

**(7)** failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

**(c) Motion for Judgment on the Pleadings.** After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings.

**(d) Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

**(e) Motion for a More Definite Statement.** A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court

Code of Massachusetts Regulations
   Title 456: Department of Labor Relations
      Chapter 15.00: Prohibited Practices (Refs & Annos)

456 CMR 15.05

15.05: Investigation

Currentness

(1) When a charge has been filed, the Director may assign the matter to an investigator. The investigator may issue an order dismissing the charge, deferring the charge to the pending grievance arbitration provisions of the collective bargaining agreement, referring any charge to one of the Department's mediators, or directing that a hearing take place.

(2) The investigator may refer charges involving police or fire fighters to the Joint Labor Management Committee, for such period of time as the Department shall determine in order to promote resolution of the issue.

(3) Unless the charge is dismissed, deferred, or referred, the investigator shall promptly meet with the parties, investigate whether settlement of the charge is possible, and clarify and narrow the issues before determining whether the charge will be forwarded to a hearing.

(4) The parties shall, at the discretion and direction of the investigator, electronically submit documentary exhibits to an investigation.

(5) The investigator may dismiss the charge without a hearing if the investigator finds no probable cause to believe that a prohibited practice has occurred or if the investigator otherwise determines that further proceedings would not effectuate the purposes of M.G.L. c. 150E.

(6) After such investigation, if the investigator determines that there is probable cause to believe that the charging party has committed a prohibited practice, the Department shall serve upon the parties a complaint and a notice of hearing.

(7) The Department may decline to issue a complaint or may withdraw any complaint issued unless it is satisfied that the charging party has made reasonable efforts to resolve the matter.

(8) No complaint shall be issued until the charging party has complied with the applicable provisions of M.G.L. c. 150E, §§ 13 and 14.

(9) If, after a charge has been filed, the investigator declines to issue a complaint, it shall so notify the parties in writing by a brief statement of the procedural or other ground for the dismissal. The charging party may obtain a review of the dismissal by filing a request therefor with the Board within ten days from the date of receipt of the dismissal. Within seven days of service of the request for review, any other party to the proceeding may file a response with the Board. The request shall contain a complete

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.     1

statement setting forth the facts and reasons upon which such request is based. Upon its own motion or upon good cause shown by any of the parties to the proceeding, the Department may extend the time for the filing of such request for review.

The Massachusetts Administrative Code titles are current through Register No. 1485, dated December 23, 2022. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 456, § 15.05, 456 MA ADC 15.05

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    ADD.020